[No. S046816. June 28, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK SCOTT THORNTON, Defendant and Appellant.

392

COUNSEL

Paul J. Spiegelman, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, Michael J. Wise, John R. Gorey and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CHIN, J.**—Defendant murdered Kellie Colleen O'Sullivan on September 14, 1993, and was arrested, tried, convicted of a number of crimes, and sentenced to death. The jury convicted defendant of the murder of O'Sullivan (Pen. Code,[1] § 187), and of kidnapping her for robbery (§ 209, subd. (b)). It found true felony-murder special circumstances on the basis of robbery and kidnapping (§ 190.2, subd. (a)(17)(A), (B)). The jury also convicted defendant of

---

[1] Unless otherwise indicated, all statutory references are to this code.

robbery (§ 211), grand theft of an automobile and a firearm (§ 487, subd. (d)(1), (2)), kidnapping (§ 207, subd. (a)), assault with a firearm (§ 245, subd. (a)(2)), receiving stolen property (§ 496, subd. (a)), petty theft (§ 484, subd. (a)), three counts of forgery (§ 470, subd. (a)), and uttering a check with insufficient funds (§ 476a, subd. (a)). The jury found true allegations, tied to the murder, kidnapping, grand theft of an automobile, robbery, kidnapping for robbery, and assault with a firearm charges, that defendant personally used a firearm (§ 12022.5, subd. (a)), and with regard to the murder, kidnapping for robbery, grand theft of an automobile, and robbery charges, that he inflicted great bodily injury (§ 12022.7, subd. (a)).[2]

The penalty phase was tried by jury. The jury returned a verdict of death, and the trial court entered judgment accordingly. The appeal to this court is automatic. (§ 1239, subd. (b).) We will modify the judgment regarding the sentence on a noncapital crime and affirm it as so modified.

## I. THE FACTS

### A. *Guilt Phase*

#### 1. *Overview*

On September 26, 1993, searchers located the decomposed body of Kellie Colleen O'Sullivan, concealed by heavy brush, alongside a remote section of Mulholland Drive in Los Angeles County. She and her vehicle had vanished on September 14, 1993. She had been shot three times in the chest. Defendant was arrested in Reno, Nevada, and charged with O'Sullivan's murder and other crimes.

Throughout the guilt phase proceedings defendant denied that he committed the first degree premeditated and deliberate murder of O'Sullivan and that the felony-murder special circumstances were true. He also maintained he did not kidnap Stephanie C., a minor. But in closing argument, without conceding the truth of the felony-murder special circumstances, he conceded he was guilty of murdering O'Sullivan under a theory of first degree felony murder.

#### 2. *Prosecution Case*

The prosecution presented a case that defendant selected O'Sullivan opportunistically for kidnapping, robbery, and, eventually, murder. Defendant, who was 19 years old, sought to steal a vehicle to use in his planned kidnap of

---

[2] In some cases, the statutory provisions have been renumbered or relettered since 1993. We refer to the current statutory designations.

16-year-old Stephanie C., who had recently broken up with him. Defendant saw O'Sullivan in or near her Ford Explorer in a parking lot, abducted her and stole her vehicle at gunpoint, and murdered her on a remote part of Mulholland Drive. After killing O'Sullivan, he used her vehicle in his kidnapping of Stephanie. Eventually he brought Stephanie to a casino in Reno, Nevada, where she alerted security personnel that defendant had abducted her.

Prosecution witnesses testified as follows:

In July of 1993, during a stay at a motel in Thousand Oaks, defendant met Stephanie C., whose family was moving from Fresno to the area. They began to date.

On July 10, 1993, defendant, accompanied by a friend, Darren Dewaele, stole a gun from a motor home parked near the motel in Thousand Oaks where he was staying.

The relationship between Stephanie C. and defendant soon became stormy, and Stephanie refused to answer his phone calls. She wanted him to leave her alone and was trying to find a way to tell him she did not want to continue the relationship. At one point defendant threatened to commit suicide.

On September 10, 1993, defendant showed up at Stephanie C.'s workplace, a yogurt shop, and pushed her to the ground; she ran inside, locked the store's front door, and called the police. Defendant, who had little money and for some time had been relying on a bicycle for transportation, told Dewaele that he was planning to kidnap Stephanie and would steal a car to head north with her.

On September 12, 1993, two days before kidnapping and murdering O'Sullivan and kidnapping Stephanie C., defendant uttered a bad check to obtain a high-quality police scanner from Radio Shack. Thereafter (apparently the next day) defendant asked a liquor store clerk how to program the scanner to receive police broadcasts. On the day of the murder and double kidnapping, defendant wrote another check to purchase, among other things, two toothbrushes and two types of deodorant, one commonly used by men and the other commonly used by women.

On September 14, 1993, the last day she was seen alive, O'Sullivan called her fiancé, Kevin White, to say she was leaving work and would be home soon. On the way she stopped at a pet store to buy bird food and left. Eyewitness testimony established that about a mile from the pet store she

may have been in the passenger seat of her vehicle, struggling with defendant. The witness to the struggle, Margaret Spalding, was driving in the left lane of a multilane road as a vehicle alongside her in the right lane swerved on the road. The vehicle's two occupants were arguing and fighting. Spalding saw clearly into the vehicle, but because she was looking from the side, she saw the driver's profile and not his face. She was, however, able to see the passenger's face. The driver, an 18-to-20-year-old, struck the passenger, a pretty blonde, several times in her midriff as he tried to maintain control of the vehicle. The man appeared angry, the woman frightened. On two occasions the woman turned in her seat and dived toward an area between the driver's lap and the steering column, as if trying to wrest something from him. She was unsuccessful; the driver fought her off as he struggled to control the vehicle. Spalding could not identify either individual during her testimony in court.

At 3:20 p.m. that day Donna des Baillets, who lived on Mulholland Drive, heard a volley consisting of three loud gunshots. Des Baillets's home was about a quarter-mile from the location where O'Sullivan's body was recovered.

After murdering O'Sullivan, defendant drove to a tattoo parlor. The tattoo artist testified that defendant arrived in the midafternoon and had "Stephanie" emblazoned on his right shoulder blade. Defendant was calm during the procedure and described Stephanie C. as his girlfriend. He told the artist that he would pick Stephanie up after leaving the parlor and they would leave town and live together.

Thereafter defendant went to the yogurt shop where Stephanie worked. Stephanie and her mother, Linda C., who was at the yogurt shop to take Stephanie home, both saw defendant standing outside the vehicle about 10:00 p.m. He immediately drove away. An hour later defendant confronted the two of them outside their home. He grabbed Stephanie and fired the gun at Linda, missing her. Defendant then forced Stephanie into O'Sullivan's vehicle under threat of death and the two left, with defendant monitoring the fraudulently purchased Radio Shack police scanner as he drove toward Bakersfield.

The next night defendant, still holding Stephanie C. captive, was in San Francisco, where a police officer stopped him for running a red light. As the officer was checking defendant's identification, defendant asked Stephanie whether he should shoot him. She told him not to do it, and he did not. Instead he fled; the police officer gave chase but was unable to apprehend him. Minutes later defendant became involved in a road rage incident with another driver, which culminated in defendant's firing a shot out of his car window.

Defendant then took Stephanie C. to parts of California north of San Francisco. Since being abducted, Stephanie had played along with defendant, keeping him calm so that he would not hurt her, and she continued to do so. Hoping to find a way to escape, she encouraged defendant to take them to the Circus Circus Casino in Reno, Nevada, where she hoped to summon help. "I knew that there was a lot of people there. A lot of security at the casino." Defendant agreed and they drove to the casino and made their way to the gaming floor. As defendant gambled he stopped paying attention to Stephanie, and she slipped away and located a security guard, telling the guard that she had been abducted. The Reno police arrived and found defendant on the casino premises. After briefly providing armed resistance, defendant submitted to arrest.

Defendant tried to escape from police custody in Reno. He struggled with Reno police officers, lunging forward and trying to pull free of them. Eventually, police placed him in a van they use for combative prisoners. Ventura County investigators interviewed him in Reno on September 20, 1993. At this point, O'Sullivan's body had not been found. In the interview, a videotape of which was played to the jury, defendant told the police that he stole the vehicle belonging to O'Sullivan when he saw it in the parking lot of a pet store, unattended, with the keys in the ignition. He denied murdering O'Sullivan. He also said that even though he had brandished a gun when he came to collect Stephanie C., she had accompanied him willingly. He claimed she left him only because she caught him looking at another woman at the casino.

A police search of O'Sullivan's Ford Explorer found the Radio Shack police scanner and a box of .38-caliber bullets located in a purse that was recovered from under a seat.

On September 26, 1993, a friend of O'Sullivan's who was searching for her found her body in thick brush near the 6.44-mile marker on Mulholland Drive. The body was significantly decomposed. O'Sullivan's body was located in a thick, low canopy of brush with an even lower entrance. A person could not stand up inside, and crawling through the entrance was difficult. There was no evidence that O'Sullivan's body had been dragged into the grotto, suggesting that defendant forced O'Sullivan to enter it while alive, where he shot her three times at close range. Her body was located by smell, not by sight.

Shortly after O'Sullivan's body was found, the police arranged for defendant's grandmother, Lois Thornton, to speak with him at the police station in hopes of obtaining incriminating statements from him. They recorded and transcribed the interview. The police told her they had just located a body that

appeared to be O'Sullivan's. But they did not know the cause of O'Sullivan's death and therefore did not describe it to her. In the midst of the conversation between defendant and his grandmother, however, they cautioned her out of defendant's hearing that if forensic evidence linked him to the body that had been found he probably would be arrested for murder. During the conversation, which was played to the jury, defendant repeatedly told his grandmother that he had committed no violent crimes. Defendant denied murdering O'Sullivan, although he commented to his grandmother, "I don't care about her, I'm just tired." He also made a number of comments that showed consciousness of guilt of serious crimes, including fears of never leaving prison.

A forensic pathologist conducted an autopsy and concluded that O'Sullivan died of multiple gunshot wounds. She would have died within minutes of being shot. He recovered three bullets from her body.

A criminalist and firearms specialist examined those bullets and compared them with a bullet test-fired from a gun that was found on defendant when he was arrested in Nevada. He concluded that the bullets used to kill O'Sullivan had been fired from that gun.

In support of its theory that defendant had previously contemplated taking victims to remote hilly areas and murdering them, and that Stephanie C. did not willingly accompany defendant to Northern California and Nevada, the prosecution introduced evidence of defendant's tumultuous relationship with Erika S., which began when she was 15 years old. On October 10, 1992, Erika, who by then was 17 years old, and defendant attended a homecoming dance at Thousand Oaks High School. They left shortly after arriving and drove to a beach in Malibu, where they argued and he struck her on her hip. They returned to the car and defendant drove recklessly through the Santa Monica Mountains, telling Erika that he was contemplating murder-suicide and would never let her date anyone else; if she started to date someone else, he would kill that person.

The next day, defendant and his friend Dewaele waited for Erika in a car outside a church and followed her home. Defendant hid behind Erika's house and, as she drove up, used a key he had stolen from her earlier to open the locked driver's door. He ordered her to drive her car back to where his car was parked, and moved her into the passenger seat of her car, which he used to transport her, against her will, into the hills above Glendale. Defendant hit her, threatened to kill them both by driving off the road and wrecking the car,

and said he could cause her to disappear in the hills and never be found. Thereafter he drove to a parking lot, parked against a wall so that Erika could not open her door, climbed on top of her in the backseat, and announced that he was going to commit suicide and would "get" anyone else she might date. Erika was able to forcibly kick him off her, and, after about an hour's conversation, defendant drove himself and Erika back to his car, where Dewaele was still waiting. He banged his head violently against his car as if attempting suicide, and appeared to be depressed. Later defendant told Dewaele he had overreacted with Erika and should not have sought her out that day.[3]

Also to show that defendant's taking O'Sullivan to a remote hilly area to kill her was not impulsive, the prosecution introduced evidence that defendant was familiar with the isolated stretch of Mulholland Drive where she was found and with its opportunities for concealing a crime. An acquaintance testified that on occasions between November 1992 and February 1993 defendant socialized in the vicinity of the murder site, drinking and listening to music with others.[4]

### 3. Defense Case

As mentioned, the defense's approach to the case changed as the trial proceeded. In his opening statement, defendant maintained that he stole an unoccupied vehicle on impulse, and did so because he thought he should leave town to avoid revocation of probation and prosecution for uttering checks with insufficient funds. In his closing argument, however, he conceded his guilt of the felony murder of O'Sullivan. Thus, the parties' primary

---

[3] In cross-examining Erika S., defendant elicited testimony that the relationship was affectionate as well as tumultuous. Defendant introduced into evidence an exhibit that showed him and Erika S. in an affectionate pose at the high school homecoming dance of October 10, 1992. Erika S. read to the jury from two love letters she had sent to defendant. The first, dated September 1, 1992, was addressed to "Markie"; in it, Erika S. conveyed these sentiments: "I was going to hire a skywriter to write all over the sky the reasons why I love you but I ran into a teensie weensie problem[—]The sky is not big enough." She further expressed that "I really do love you, Markie. Whether you believe it or not, I hope we are together forever, and that we can learn to accept each other as we really are. I love you, love always, Erika [S.]." The second letter, dated September 10, 1992, contained similar sentiments.

Erika S. also testified that at the time she loved defendant. Later, as described in the text, the relationship soured, and on October 14, 1992, she filled out a court form, which she read to the jury on cross-examination, in which, as relevant here, she said, "For the past two months I have been trying to break up with Mark but he always cries and threatens to kill himself."

[4] There was also evidence of other crimes for which defendant was tried before the same jury. These are not at issue in this appeal. Defendant burglarized a vehicle rented to one Heidi Conn; Conn's stolen property was later located in O'Sullivan's vehicle. He uttered checks not backed by sufficient funds. From August 30 to September 13, 1993, defendant was the tenant of Orlando and Leonora Tafurt in Thousand Oaks. He stole property from them, including checks that he used to obtain cash, and Orlando Tafurt's gold watch.

dispute centered on the truth of the special circumstance allegations. Throughout the trial, defendant consistently presented a defense that he did not commit premeditated and deliberate murder and that he did not commit murder in furtherance of robbery or kidnapping, thus negating the felony-murder special-circumstance allegations.

Before eventually conceding that defendant was guilty of the felony murder of O'Sullivan, the defense presented evidence that defendant was not socializing in the vicinity of the murder scene between November 1992 and February 1993, implying that he was not familiar with the area where O'Sullivan's body was found. The evidence consisted of testimony that his car was physically repossessed on November 9, 1992, and that he was living in Oceano, approximately 140 miles distant, on December 2, 1992, and remained there until February of 1993. The operator of a store in the same shopping center as the pet store from which defendant abducted O'Sullivan testified that he heard no commotion or screams. And Nancy L. Briscoe testified that she believed she saw O'Sullivan alive and alone in her vehicle late on the afternoon of September 14, after the time that Donna des Baillets, who lived on Mulholland Drive near the murder scene, heard the gunshots that, in the prosecution's view, marked the execution of O'Sullivan.

Defendant also presented evidence that his actions against O'Sullivan and Stephanie C. were spontaneous and impulsive rather than the product of deliberation and premeditation, and that in the days preceding the crimes he took actions inconsistent with an intention to leave Southern California. For example, in the days before murdering O'Sullivan, defendant bought a 60-gallon fish tank and a pager that would not work outside of Southern California, and hence would be useless in the northern part of the state to which defendant later took Stephanie.

In addition, defendant presented evidence to counter the prosecution's theory that he forced O'Sullivan into the brushy grotto and shot her execution-style. The forensic ballistics evidence was inconclusive and it could not be ruled out that both defendant and O'Sullivan were standing outside the grotto when she was shot and that she crawled or was moved into the grotto only afterward. Cross-examining a prosecution witness, defendant had previously adduced evidence that O'Sullivan's pantyhose showed no residue at the knees, suggesting that she was not kneeling when shot. Defendant maintained the prosecution had not proved that the felony-murder special circumstances were true: defendant and O'Sullivan might have struggled and he shot her impulsively and defensively.

As for the kidnapping of Stephanie C., defendant introduced evidence that she went with him willingly and was not kidnapped. An employee of a privately operated San Francisco amusement site that the two had visited testified that several uniformed security guards regularly patrol the premises and Stephanie could have sought their help. A camper at a campsite the two used testified that he talked with defendant at the men's bathroom, not within sight of Stephanie, who was nearby, evidently using the women's bathroom. The camper saw defendant and Stephanie laughing and testified that she teased defendant about getting lost and causing her to look for him.

### B. Penalty Phase

#### 1. Overview

The prosecution presented evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) The defense presented evidence that defendant had learning disabilities and was emotionally disturbed. It also presented evidence bearing on defendant's birth, background (including a difficult childhood and adolescence), and character. On rebuttal, the prosecution presented evidence that defendant's birth was essentially normal, he did not have serious learning disabilities or low intelligence, and he was antisocial in high school.

#### 2. Prosecution Case

##### a. Victim Impact Evidence

O'Sullivan's mother, Sharlene Cunningham, presented victim impact evidence. O'Sullivan was her only daughter. O'Sullivan's murder left her young son, Clifford, without a mother to raise him.

##### b. Factor (b) Evidence

Erika S. testified further at the penalty phase. It will be recalled that at the guilt phase there was testimony that on October 10, 1992, Erika, who was 17 years old, and defendant attended a high school dance. They left shortly after arriving and drove to a beach in Malibu, where they argued. At the penalty phase, the jury learned that defendant committed a sexual battery on Erika on the beach, running his hand under her dress and touching her vaginal area. The next night, after Erika left the church event about which there also was guilt phase testimony, defendant forced her into the backseat of a car, told her he wanted to have sexual intercourse with her, ignored her crying and her refusal, inserted a finger in her vagina, and told her that he "could rip out

[her] insides." After Erika kicked him in the head, he removed his finger and apologized. Erika obtained a restraining order against defendant but, because she did not want her mother to know about the sexual assaults, did not describe them on the application form.

The prosecution also presented evidence of defendant's violent or menacing acts in county jail while awaiting trial. On October 6, 1993, a deputy sheriff searched defendant's cell and found a paper clip, a toothbrush, and two razor blades that had been turned into one or more potential weapons. On January 14, 1994, following a search of defendant's cell that again produced contraband, defendant had to be subdued by sheriff's deputies, saying it was lucky there were three of them, because otherwise he would have tried to stab them. As one of the deputies described defendant's threat, he told them, "I was looking to stick your ass."

On February 8, 1994, more contraband was discovered in defendant's cell. A blade that had been removed from a disposable razor was found taped underneath his bed.

### 3. Defense Case

#### a. Defendant's Biological Family Background

Defendant's mother, Markita Thornton, was a habitual substance abuser before and after defendant's birth. She drank and used drugs before learning she was pregnant with defendant, and her mother testified that she saw Markita drunk during the pregnancy, though Markita denied it on the witness stand. Defendant's biological father, Steve Miller, beat Markita during her pregnancy with defendant, including delivering a blow to her abdomen during her seventh or eighth month. Miller died when defendant was four years old. Markita Thornton testified that Miller saw defendant only about seven times.

Markita Thornton testified that defendant's aunt was mentally "a little slow" and, as far as she knew, had never attended school. A doctor had diagnosed her as being cognitively impaired.

Markita Thornton repeated the third grade, was expelled from one junior high school, and attended but did not graduate from high school. She had a history of minor crimes dating back to her teenage years.

#### b. Defendant's Stepfather

Pierre Sarrazin, a Montreal native who was a prolific car thief as an adolescent before moving to California, met Markita Thornton in Los Angeles when defendant was about two years old. Sarrazin later became defendant's stepfather.

### c. *Defendant's Birth and Early Childhood*

Defendant was born on July 16, 1974. Lawrence William Scott, M.D., the gynecologist and obstetrician who delivered him, testified that his birth was medically complicated and difficult, and he may have been born brain-damaged, though Dr. Scott was not concerned about defendant's neurological status at birth. Nor, according to the testimony of other witnesses, including Carter R. Wright, M.D., a pediatrician, was defendant's first year of life auspicious. He would not breast-feed and failed to gain weight normally.

Markita Thornton was distracted during defendant's early years by a chaotic lifestyle that included multiple boyfriends and alcohol and drug abuse. She turned defendant over to his maternal grandmother, Lois Thornton, for substantial amounts of parenting, including when she went to scavenge garbage cans in the neighborhood when defendant was young.

Defendant was called unmanageable in kindergarten and had to repeat the school year for academic reasons. Just before starting kindergarten, he was bitten by a dog, and he saw a psychiatrist to deal with the incident. The psychiatrist, Brian Paul Jacks, M.D., saw defendant beginning in January of 1980, treated him for a year and a half, and diagnosed him with depression, neurological problems, and attention deficit hyperactivity disorder (ADHD).

School records showed that at about age six defendant was diagnosed as having a behavioral disorder that resulted in recommendations that he be put in a special classroom and see the school psychologist once a week.

Dr. Jacks saw defendant again in 1985, when he was about 10 or 11 years old, and reconfirmed his diagnoses of depression and ADHD.

### d. *Defendant's Formative Years Before the Crimes*

Witnesses testified that Pierre Sarrazin preferred defendant's younger sister Chantal to him, which angered defendant. One witness described defendant's role in the family as akin to "a piece of lint on a suit." Sydnie Goldfarb, who was then pursuing a master's degree in marriage and family counseling, became acquainted with defendant's family through a social connection in the spring of 1992, about a year and a half before defendant's crimes. She testified that Sarrazin basically ignored defendant, but when he spoke to him it was in a demeaning tone. Markita Thornton showed no affection toward defendant and ignored him. Sarrazin and Markita Thornton bickered regularly and did not seem to have a close relationship. In general, defendant seemed to be a particularly unhappy adolescent.

When defendant was 16 years old and in 10th grade, he lived with the family of Berta Siy from Monday through Friday of each week in order to be eligible to spend the 1990–1991 academic year at Hoover High School. He liked the Siys and asked the Siy family to adopt him. Siy testified at trial that defendant "is very nice" and was nice when he was in the 10th grade as well. Defendant's academic performance at Hoover High School, however, mirrored his experiences with schoolwork elsewhere, which were problematic. He was classified as learning-disabled during his school years, struggled to learn, had attendance and behavioral problems, and dropped out of high school in 1992. At Thousand Oaks High School, he was placed in a class for the emotionally disturbed. In 1992, just before defendant dropped out of high school, school records noted that he was contemplating suicide, would cry, had no money or food, was experiencing problems with his mother and stepfather, and was living in a car. An educational consultant, Carol Horwich Luber, testified that the school system failed to provide early intervention, during elementary school, with the type of specialized services that would have made him "a much more successful student in elementary, junior high and high school."

In April of 1993, about five months before defendant committed his crimes, his mother attempted suicide. During that time, Sydnie Goldfarb went to defendant's house and found defendant crying and his sister distraught.

Defendant had no bed or bedroom at his house and slept on the floor. At other times, when Sarrazin and Markita Thornton could not tolerate his presence, he slept in his car or at friends' houses and was emotionally overwrought. He held a job at an automobile oil-change establishment for only 11 days. During this time, Pierre Sarrazin and Markita Thornton attempted to evict him after Sarrazin caught him siphoning gasoline out of his truck, but the police informed defendant's parents that they could not force him to leave the house before age 18. So defendant stayed for a short time before being taken to Bakersfield to live in a trailer with his maternal grandmother, Lois Thornton, and her boyfriend. He soon returned home; his mother again asked him to leave but eventually relented and let him live in a tent in the backyard.

At the time defendant assaulted Erika S. in October 1992, he was suffering emotional stress and contemplating suicide. He again went to live with Lois Thornton, this time in Oceano, in San Luis Obispo County, where he was depressed and could not sleep. When he returned home to Ventura County, police arrested him on a charge of automobile burglary. Defendant found work at an automotive repair shop and remained employed about a month, until his stepfather, who also worked there, fired him because he disapproved of defendant's spending his money on radio-controlled model racing cars.

e. *Medical Evidence*

A pediatric neurologist, William David Goldie, M.D., reviewed defendant's medical records from birth and his school records, and performed an electro-encephalogram (EEG) on him. He identified significant pediatric neurological difficulties, eating and walking problems, a low intelligence quotient (though, as will appear, there was other penalty phase testimony that defendant's intelligence was average, and Dr. Goldie ultimately conceded the point on cross-examination), and the need to repeat kindergarten. Defendant's EEG revealed a mild to moderate degree of abnormal brain function.

Marc Roman Nuwer, M.D., a professor of neurology at the University of California, Los Angeles medical school, testified that defendant's EEG was mildly, though not moderately, abnormal and suggested brain abnormalities that could result in mild retardation, hyperactivity, and behavioral problems. In Dr. Nuwer's opinion, defendant's condition could not be attributed to drowsiness or to medications he was taking.

C. *Prosecution's Rebuttal Case*

The prosecution presented the testimony of Alex Soffici, M.D., director of maternal fetal medicine at Santa Barbara Cottage Hospital. He reviewed defendant's delivery and pediatric records and the testimony of Dr. Scott. On the basis of that review, he testified that defendant's birth was essentially routine, with no significant complications either to him or Markita Thornton. Based on the records he reviewed, he doubted that defendant's birth caused him any brain damage.

There was testimony from defendant's high school teachers and other school officials regarding his viciousness and his propensity to squander his potential. Anita Dacles, one of defendant's teachers in special education classes, testified that he was regularly absent, but when present he would bully her and other students, mock her foreign accent, and refuse to do schoolwork. He was generally a disruptive presence in the class, and was too intelligent to be in special education classes. He refused to consider applying for outside employment that she located for him. Another special education teacher who taught defendant, Richard W. Saunders, also described him as disruptive and, in essence, mean-spirited. Defendant attended class about two-thirds of the time, and when present he taunted, and encouraged others to taunt, a student who used a wheelchair and another student with hygiene problems. Like Dacles, Saunders testified that defendant was overqualified to be placed in special education classes. Defendant's basic math teacher at Hoover High School, Joyce Borgman, characterized him as defiant, angry, dishonest, and unwilling to dedicate himself adequately to his schoolwork. Kevin Welsh, a

vice-principal at Hoover High School, confirmed in his testimony that defendant was unruly, defiant, dishonest, belligerent, and generally antisocial.

A special education teacher and educational therapist who taught defendant at Conejo Valley Continuation School, Al Frankfurter, testified that defendant was a "con artist" and dishonest. Frankfurter agreed with the prosecutor that defendant could be characterized as someone who "was always trying to get away with things." He taunted a student he believed to be gay and, on learning that Frankfurter was Jewish, tauntingly asked the meaning of the slur "kike." He suggested that if sent to the vice-principal's office for disciplining, he would like to sodomize that official. He said he would kill Frankfurter for calling his mother to report his frequent unauthorized absences from class, although his tone of voice indicated playfulness rather than a considered threat. Defendant had no specific discernible learning disability. On cross-examination, Frankfurter testified that defendant lacked self-esteem and seemed emotionally starved and financially deprived. He agreed with defense counsel that defendant had to be "his own parent."

Ellen Walley, the attendance officer at Hoover High School, testified that defendant was regularly absent without authorization, and that when she would contact defendant's stepfather and Berta Siy, about the problem, both told her, either explicitly or in essence, that defendant was uncontrollable.

Linda Calvin, who holds a doctorate in educational psychology with an emphasis in child growth and development, reviewed a number of defendant's records and other documentary evidence, and testified there was no conclusive evidence that defendant suffered from attention deficit or attention deficit hyperactivity disorders. Nor was it likely that he had another learning disorder, or if he did, it was mild to moderate. She also testified that defendant showed average intelligence.

To counter the evidence of Dr. Goldie, the defense witness who testified that defendant had an abnormal EEG, the prosecution called William Sutherling, M.D., a neurologist, who testified that the EEG results, though abnormal, should be attributed to defendant's being maintained on two "neuroleptic medications" that generate abnormalities on EEG examinations. Defendant had anticipated this testimony, and in his case-in-chief adduced testimony from Dr. Nuwer that Dr. Sutherling's conclusion was incorrect. In turn, Dr. Sutherling testified that he disagreed with the conclusions of Drs. Goldie and Nuwer.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Denial of Motion to Dismiss the Indictment*

The case against defendant began by grand jury indictment. Before trial, defendant moved to quash the indictment on the ground that the district attorney's office had helped to select the grand jurors, in violation of the separation of powers clause of the California Constitution (art. III, § 3) and the due process guaranties contained in the California and federal Constitutions. The trial court conducted a hearing on the motion and denied it. The Court of Appeal subsequently denied defendant's petition for writ of prohibition, and we denied review.

The trial court entertained the motion on the basis of defendant's points and authorities and an answer submitted by the prosecution, which contained declarations. Prosecution declarations made by an investigator for the district attorney averred that the district attorney's office performs a criminal history check on prospective grand jurors who have applied to serve on the grand jury, and interviews the applicants' neighbors, acquaintances, employers, and other references. Once the district attorney's office completes its investigative work, it sends a memorandum to the presiding judge of the superior court, summarizing the results of its background checks. The prospective grand juror applications remain confidential within the district attorney's office, and individual deputy district attorneys are not asked to give an opinion on individual prospective grand jurors unless the applicant lists a deputy district attorney as a reference.

Another declaration, from the manager of the Ventura County Jury Commissioner's Office, explained: "All applications received by Jury Services are forwarded to the Office of the District Attorney for . . . background investigation and subsequent report to the Court. The District Attorney advises the Court of any potential individual exclusion based on the statutory qualifications for service and other information (such as reputation for honesty and integrity) that bears on a prospective grand juror's ability and suitability for service." "Three judges . . . analyze the prospective grand juror questionnaires in light of . . . the results of juror interviews . . . and background reports from the District Attorney. The [judges] . . . recommend[] 30 persons for a proposed Grand Jury panel to the full compl[e]ment of Superior Court judges. [¶] . . . [T]he Superior Court judges review the proposal . . . and finally select 30 persons, including any jurors held over from the previous grand jury . . . . From that pool, the Grand Jury is finally impaneled, by the Clerk's drawing of 19 names."

Defendant relied on a letter dated November 12, 1993, and sent from the district attorney to the presiding judge of the superior court, in which the district attorney observed that he had heard three grand jurors felt they were free to disregard the evidence and the law in one case and thus improperly blocked an indictment of a criminal defendant.

In denying the motion, the trial court stated, "I disagree with what's been characterized as the District Attorney's office giving the Court advice [on selecting grand jurors]. I don't believe they give the Court advice. I think they give us information which the Court needs in order to have a—an adequate and law-abiding grand jury."

Defendant contends the court erred in denying his motion to quash the indictment. He contends that the district attorney's investigative role usurped the function of the judiciary in selecting grand jurors. "[T]he District Attorney crossed the line from merely assisting the Superior Court by providing preexisting information on prospective [grand] jurors to conducting its own investigation [by means of information gleaned from] neighbors and employers[,] with the power to shape the information provided to the court." Defendant objects to what he views as the ultra vires "power of the prosecutor to make discretionary judgments about what information the court will get . . . ." In light of the November 12, 1993, letter, defendant maintains, "the record suggests that the District Attorney's decision to expand his office's role in the process of selecting grand jurors was a policy decision made at the highest levels and motivated in part by dissatisfaction with the decision by the grand jury not to indict in a particular case."

The Penal Code contains a number of statutes governing the selection of grand jurors (see, e.g., §§ 893, 896, 900, 902, 903.1, 903.2, 908.2, 909), and it is evident that the jury commissioner followed the relevant statutory directives. Respondent argues that the statutes require preliminary determinations of the basic qualifications of potential grand jurors and that the district attorney's office, with its investigative capacity, is ideally suited to gather this basic information. Performing this task, respondent maintains, does not violate the state or federal Constitution.

We find no evidence in the record that the grand jury that indicted defendant was formed by an unconstitutional process. Plainly, the superior court judges selected the grand jurors, relying on their own inquiries and routine background checks performed by the investigative staff of the district attorney's office. Except insofar as a finding by the investigative staff would result in statutory disqualification, the judges enjoyed unfettered discretion in their use of the staff's findings, and the district attorney's office's role was limited to providing the investigative services requested by the jury commissioner, a judicial officer (Code Civ. Proc., § 195; *Adams v. Superior Court*

(1974) 12 Cal.3d 55, 59 [115 Cal.Rptr. 247, 524 P.2d 375]; *Pantos v. City and County of San Francisco* (1984) 151 Cal.App.3d 258, 262 [198 Cal.Rptr. 489]). The judges were free to give any weight they wished to the results of the district attorney's staff's interviews of prospective grand jurors' neighbors, employers, and acquaintances, and to disregard the results entirely if they wished. It cannot be said that the district attorney's office played any role beyond the limited functions the superior court delegated to it in shaping the constitution of the grand jury. The district attorney's complaint about the conduct of three seated grand jurors, defendant contends, is a significant indication of overreaching by the district attorney's office. The complaint, however, has no bearing on the procedures used to constitute the grand jury. The trial court properly denied the motion to quash the indictment.

### 2. Excusing Prospective Jurors for Cause over Defense Objections

■ Defendant contends the court erred in excluding for cause four prospective jurors because of their views on the death penalty, in violation of his state and federal constitutional rights. The applicable law is settled. The trial court may excuse for cause a prospective juror whose views on the death penalty would prevent or substantially impair the performance of that juror's duties. (*People v. Mayfield* (1997) 14 Cal.4th 668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." (*Ibid.*) "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, ___ [167 L.Ed.2d 1014, 1022, 127 S.Ct. 2218, 2224].)

As we explain, we have reviewed the record as to each of the four prospective jurors and find no basis on which to overturn the trial court's rulings. All gave conflicting and sometimes ambiguous statements, but all also made statements supporting the court's findings that their views would at least substantially impair their performance of their duties. The fact that these jurors also gave statements that might have warranted keeping them as jurors does not change this conclusion. "The question before us as a reviewing court . . . is whether the evidence supports the actual rulings, not whether it would have supported different rulings." (*People v. Smith* (2003) 30 Cal.4th 581, 602 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

### a. *Prospective Juror No. 4 of October 17, 1994*

On his written juror questionnaire, when asked to rate himself on a scale of 1 to 10, with 1 being strongly against the death penalty and 10 strongly in favor of it, Prospective Juror No. 4 of October 17, 1994, marked that he was a 2. He answered the questionnaire's inquiry, "Briefly describe your general feelings about the death penalty," with "I would really not want to be confronted with the decision to apply the death penalty." The questionnaire also asked, "assuming a defendant was convicted of a premeditated murder during the course of a kidnapping and robbery and a special circumstance, would you: [¶] (a) No matter what the evidence was, always vote for the death penalty. [¶] (b) Always vote for life without possibility of parole. [¶] (c) I would not automatically vote for either life without possibility of parole or the death penalty. I would consider all the evidence and vote my conscience." The prospective juror checked choice (c).

At jury voir dire, this prospective juror stated that he might be an unsuitable juror from the perspective of both parties. Defendant might find him undesirable to serve on the jury because defendant had lived next door to the prospective juror briefly and the victim could have been his wife or daughter. The prosecution might find him undesirable because "[i]t would be with great trepidation that I would vote for the death penalty."

Both parties questioned this prospective juror extensively regarding his attitude toward the death penalty He gave conflicting and equivocal responses. He told defense counsel "I would find it quite difficult to . . . rule [on] the . . . death penalty," but "I would not say it is impossible." This was the first of three times that the prospective juror told defense counsel that he would find it difficult to decide the question of penalty.

Asked by defense counsel, "You feel that there are some murder cases w[h]ere you would consider the death penalty as a possible sentence?" the prospective juror replied, "Right now without hearing it I would probably say no. But if I heard all of the details, I may be convinced." He told defense counsel that he thought he would consider both sentencing options. But when defense counsel asked the same question in a different way, "Do you feel you would be able to consider all of the aggravating and mitigating evidence?" he replied, "With difficulty . . . ."

Thereafter the prosecutor questioned the prospective juror. The prosecutor explained, "If your conscience tells you that [the lesser sentence] is the appropriate penalty you could have a feeling that the aggravating circumstances . . . overwhelmingly outweigh the . . . 'mitigating circumstances,' and yet the law does not require you to vote for the death penalty." The

prospective juror responded, "You are making it easier for me. [¶] . . . [¶] . . . I would not feel so guilty about, you know, religiously or any other reason about voting for the death penalty. . . ." The prosecutor sought clarification: "Could you explain that a little bit now? 'It makes it easier?' " The prospective juror answered, "Because you just said that there is no circumstance that would make me—there is no circumstance unless—in other words, you would not back me into that situation."

The prosecutor queried, "using the words that you yourself used a few minutes ago, you said 'When it comes right down to the wire,' you are not sure if you could vote for the death penalty. [¶] Knowing that there is no circumstance where you have to, when it comes right down to the wire do you feel that . . . if you had the option between either the death penalty or life in prison without possibility of parole[,] . . . you would always vote for life in prison without possibility of parole?" He answered, "I feel like saying 'yes,' but, you know, then again it depends on the—probably the information. [¶] Right now I—it's like saying I can't think of any scenario that would, you know, like information that would lead me to say nothing but death penalty, but, you know, we all learn."

The prosecutor asked him about his juror questionnaire response that he was a 2 on a scale of 1 to 10 of favoring the death penalty. The prospective juror affirmed his view. The prosecutor then asked, "When I consider that combined with what you have told us about how you expect your conscience would bother you if you voted for the death penalty . . . , I get the impression . . . that as long as you were not backed into a corner where you were required to vote for the death penalty, that you always had an option, that you would always vote for life in prison. Is that impression correct?" The prospective juror replied, "Not—not completely, no." The prosecutor asked, "Can you tell me how it is wrong?" and the prospective juror replied, "I am not sure I know how to answer that. [¶] Just like I said to the lady on the Defense there, . . . it is similar to if you were being attacked or felt that strongly that you would in fact kill someone else, you know, that you could rise to that occasion. . . . [¶] . . . [¶] That I could essentially, personally, be judge, jury and executioner if somebody was attacking me, which is actually going no further than what I would be asked to do, you know, serving on a jury where I am only asked to be the juror."

The prosecutor asked, "with your attitude toward the death penalty . . . do you think you would be a fair juror to the Prosecution, considering your attitudes toward the death penalty, and considering [that] the Prosecution will be asking you to vote for the death penalty?" The prospective juror replied, "you should judge that up front, the fact that I marked '2' on the scale of 1-to-10." He soon added, "when you say 'fair to the Prosecution,' I would be

certainly on the biased side against the Prosecution in that case, certainly. Certainly I would. [¶] I would not be to your advantage. It would be with great trepidation that I would vote for the death penalty, that's obvious."

Finally, the prosecutor asked, "Well, is it true that to vote for the death penalty you would have to go against your conscience and how you feel about the death penalty?" He responded, "I would say I would really have to. That would be pretty much it. I have to go against my conscience."

The trial court excused him, stating, "The gentleman is an enigma. He said a lot of things that were inconsistent and a lot of things I, frankly, did not understand, but I'm not convinced that he could be fair to the People."

In light of this prospective juror's conflicting and equivocal statements, we must defer to the trial court's ruling.

### b. *Prospective Juror No. 3 of October 6, 1994*

Substantial evidence also supports the trial court's ruling that Prospective Juror No. 3 of October 6, 1994, was substantially impaired in her ability to impose capital punishment in a proper case. She gave conflicting answers throughout voir dire. At times she stated that she could follow the law. But at other times she expressed either doubt about her willingness to impose the death penalty or an inability at all to do so. For example, she stated, "I can't conceive of taking somebody's life," and "I couldn't take the life of a cat or [a] dog."

Defendant argues that the trial court granted the challenge for cause of this prospective juror on the assertedly incorrect ground that "I don't think she quite understands the area of discretion that remains" in deciding sentence. He maintains that the court could have educated the prospective juror with additional comments or questions. But the court also said, "I think she's prejudiced against the death penalty." The court was stating, in a shorthand form, its conclusion that she could not follow her oath or the law. Substantial evidence supports that conclusion.

### c. *Prospective Juror No. 4 of October 11, 1994*

Prospective Juror No. 4 of October 11, 1994, stated that because of her strongly felt opposition to the death penalty she would find it "difficult . . . even if the aggravating circumstances were overwhelming in comparison to the mitigating" to follow the sentencing instructions. To be sure, she gave conflicting answers, including an ability to keep an open mind until all of the evidence had been presented. But the prospective juror stated that her

openmindedness amounted only to a "shred." She acknowledged stating on her questionnaire and reaffirmed her belief that, as the prosecutor quoted from her questionnaire, "I do not think I believe in the death penalty. I feel it's ultimately wrong for a human to decide that another must die." "[I]t's too arbitrary," she explained. The prospective juror also expressed doubt that she could convict defendant of crimes that could lead to a death sentence. She alerted the trial court and parties to her fear that her attitudes could lead to a mistrial at the penalty phase. The court implicitly concluded that the prospective juror was substantially impaired, and granted the challenge. Substantial evidence supports its decision.

### d. *Prospective Juror No. 5 of October 18, 1994*

Prospective Juror No. 5 of October 18, 1994, made a number of conflicting oral and written statements. She wrote on her questionnaire, "As a Catholic I was brought up not to judge anyone. God was the only one with that right." She checked that she would always vote for life imprisonment without possibility of parole.

In response to questions by defense counsel, this prospective juror stated that she could set aside her religious beliefs and vote to impose the death penalty on defendant if persuaded it was warranted. In stating that she could vote for the death penalty, she expressly retracted the choice she had made on her juror questionnaire that she would always vote for life imprisonment without possibility of parole.

On further voir dire by defense counsel, this prospective juror said that, contrary to her responses to some of the prosecutor's questions, she could vote for the death penalty in a proper case even if it meant, in counsel's words, that she "would go against your own personally held beliefs." Presented with a followup question by the trial court, she responded, after a pause of unknown length, that it would not be a sin to vote to impose a death sentence on defendant.

Defense counsel conceded that this prospective juror had "gone back and forth just like many jurors have . . . ." But he argued that made her no different from other prospective jurors whom the trial court had passed for cause. The court pronounced her "another enigma . . . . I really don't know what she is going to do." But he concluded that she would have to choose between her religious beliefs and the law, and "I just don't have enough confidence that she is going to follow the law."

We must also defer to this ruling.

### e. Conclusion

The record here is similar to that in *People v. Griffin* (2004) 33 Cal.4th 536 [15 Cal.Rptr.3d 743, 93 P.3d 344], where we also rejected the defendant's claim that four prospective jurors who had been excused on the ground of substantial impairment in their ability to impose capital punishment were improperly excused. Here as there, "the trial court had the opportunity to observe the demeanor and to assess the degree of uncertainty and reluctance of each prospective juror and resolved any equivocal and conflicting responses in a manner that caused the court to conclude that each of these jurors' views . . . would substantially impair the juror's ability to make a penalty determination in accordance with the court's instructions. On this record, we have no reason or basis for second-guessing that finding. Contrary to defendant's suggestion, the fact that at some point each of these prospective jurors may have stated or implied that she would perform her duties as a juror did not prevent the trial court from finding, on the entire record, that each nevertheless held views . . . that substantially impaired her ability to serve." (*Id.* at p. 561.) Defendant's claim is without merit.

### 3. *Treating Death- and Life-leaning Prospective Jurors Differently*

Defendant claims that the trial court violated the federal constitutional guaranties of due process of law, trial before an impartial jury, and equal protection of the laws by applying different standards in ruling on motions to excuse for cause jurors who seemed to favor the death penalty and those who seemed opposed to it. He maintains that the court applied different standards in determining whether the two groups of jurors were substantially impaired in their ability to follow the law and that it used different procedures in evaluating them. According to defendant, the trial court focused on whether the death penalty adherents were committed to following his instructions regarding aggravating and mitigating evidence and did not examine critically whether they could be fair on the issue of sentence, whereas with death penalty skeptics, the court did the reverse, not concerning itself with whether prospective jurors would commit to following its instructions, but examining critically whether they could be fair to the People. This differential inquiry, he maintains, raised the barrier for the death penalty skeptics to serve on the jury vis-à-vis that faced by the death penalty adherents. Procedurally, defendant asserts, the court asked fewer questions of the prospective jurors the prosecution challenged for cause than of those defendant challenged, thereby rehabilitating death penalty adherents without attempting to rehabilitate skeptics.

The contentions are without merit. As stated, "the qualifications of [prospective] jurors challenged for cause are matters within the wide discretion of the trial court, seldom disturbed on appeal." (*People v. Jones* (2003) 29 Cal.4th 1229, 1246 [131 Cal.Rptr.2d 468, 64 P.3d 762]; see *Uttecht v. Brown, supra*, 551 U.S. at p. ___ [167 L.Ed.2d at p. 1022].) A trial court "possesse[s] discretion to conduct oral voir dire as necessary and to allow attorney participation and questioning as appropriate." (*People v. Robinson* (2006) 37 Cal.4th 592, 614 [36 Cal.Rptr.3d 760, 124 P.3d 363]; see *People v. Carter* (2005) 36 Cal.4th 1215, 1250 [32 Cal.Rptr.3d 838, 117 P.3d 544] [manner of conducting voir dire not basis for reversal unless it makes resulting trial fundamentally unfair].) No abuse of discretion occurred in the court's determination of the prospective jurors' qualifications to serve or its manner of conducting voir dire.

We have reviewed the voir dire of each prospective juror to which defendant refers in this claim, namely five challenged by the defense (Deborah P.,[5] Prospective Juror No. 10 of Oct. 4, 1994, Prospective Jurors Nos. 3 and 10 of Oct. 5, 1994, and John O.) and additional prospective jurors challenged by the prosecution (Veronica R. and Prospective Juror No. 10 of Oct. 6, 1994). In assessing defendant's contention, we have also considered the trial court's treatment of four other prospective jurors, discussed above (see, *ante*, at pp. 414–418), whom the prosecutor challenged. We see nothing suggesting the court applied different standards to the various jurors. Indeed, the court explained on the record that it was applying the same standards regardless of whether the prospective juror favored or opposed the death penalty. "The bottom line in my mind," the court stated, "is whether they will follow the law no matter what their leanings are or what their inclinations are. [¶] If I am convinced after I hear everything they have said that they will follow the law, then I will deny the challenge." The court went on: "If I have a doubt as to whether they will follow the law or think they won't, then I will grant the challenge, and that is what I have been ruling, basing the rulings on." The court also advised counsel that "every time I have a doubt in my mind I'm going to resolve it in favor of the Defendant because he has got his life on the line and because I'm concerned about having to try this case over again."

We first address the five prospective jurors in question whom the defense challenged. In each case, the trial court denied a motion to excuse the prospective juror for cause.

(1) Deborah P. stated generally during her voir dire that she would be openminded, follow the trial court's instructions, and, at any eventual

---

[5] Some of the prospective jurors are referred to by name and others by number. Evidently the trial court elected to change its method of identifying them as voir dire proceeded.

penalty phase, listen to the presentation of evidence without prejudging defendant's deserved punishment. But she also stated initially that she would not consider evidence of parental neglect or abuse of defendant in childhood or his consumption of alcohol or drugs as mitigating evidence; she would base her decision solely on the circumstances of the crimes.

Defense counsel then asked if Deborah P. would vote for the death penalty if it were proven that defendant had committed premeditated murder with special circumstances. The prosecutor objected to that question as calling for speculation. The trial court sustained the objection and proceeded to explain the bifurcated nature of a capital trial to Deborah P., asking whether at any eventual penalty phase she would consider all the evidence that the court directed her to evaluate. She answered that she would, and affirmed that view during further examination by defense counsel and the prosecutor.

Deborah P. also stated that her best friend was murdered by her husband in 1987. She testified as a character witness for her deceased friend, in a case prosecuted by the prosecutor in defendant's case. She stated that because she knew nothing about defendant, neither the murder of her friend nor the prosecutor's involvement in that case would affect her ability to judge defendant fairly. Despite her connection with the decedent in that case, she had not followed the trial.

In addition, less than three months before Deborah P.'s voir dire testimony, the father of her daughter (the two were never married) also was murdered. She considered him a friend. Her daughter had recovered from the experience. Deborah P. stated that despite a degree of similarity between the murder of her daughter's father and of O'Sullivan, who had a child, she could remain impartial in passing sentence on defendant if the trial reached that stage. She felt that the death penalty should be imposed only for certain types of murders, not all of them. She maintained that she had no opinion about the propriety of the death penalty.

Defendant predicated his challenge for cause on an assertion that Deborah P. would be biased because her friend had been murdered and the prosecutor trying the case against defendant had prosecuted the murderer in the prior case. The trial court denied the challenge, stating that Deborah P. "is indicating she is going to have some difficulties, but she feels she will deal with it and I'm going to take her word for it."

(2) Defense counsel's voir dire of Prospective Juror No. 10 of October 4, 1994, revealed that she held unorthodox views about criminal procedure and the rights of criminal defendants but would subordinate those views to the law. In addition, the prospective juror declared that in her mind defendant

was guilty of the murder of Kellie O'Sullivan, that the murder was senseless, and that to murder a mother of a child for no reason is especially depraved; hence she would be biased against defendant. She opined that the death penalty is "morally right." She emphasized that although she would lean toward the death penalty if at the guilt phase defendant were shown to have committed premeditated murder and was death-eligible, she would not automatically impose the greater sentence under those circumstances. But she also stated that she would not find certain types of mitigating evidence helpful, though she would listen to its presentation.

The trial court asked the prospective juror to clarify her views, and she explained that she would do more than merely listen to the presentation of mitigating evidence while simultaneously rejecting it out of hand, but would actively consider any such evidence in deciding sentence. The court asked her if she could be fair to both parties at any eventual penalty phase, and she said yes. The court denied defendant's challenge for cause, stating that initially he was dubious of the prospective juror's ability to be fair but had become "satisfied that now she understand[s] what the law is and that she will follow the law . . . ." Clearly the court found it necessary to ask the prospective juror questions to reach a decision about her, and doing so was not unfair to defendant. The court's conclusion regarding the juror's qualification to serve, moreover, is supported by the record.

(3) Prospective Juror No. 3 of October 5, 1994, stated, in answer to defense counsel's questions, that she favored the death penalty for all premeditated murders regardless of the mitigating evidence of defendant's childhood difficulties. The prosecutor thereafter attempted to rehabilitate the prospective juror. In response to the prosecutor's voir dire, the prospective juror said, "I feel that I am strongly in favor of the death penalty," but conceded that circumstances might conceivably exist that would "sway" her from imposing a death sentence. She would "try" to deliberate on sentence with an open mind.

The trial court explained to this prospective juror that even the most horrendous murder imaginable would not automatically result in the death penalty under California law. It asked her whether she could weigh the evidence fairly. She replied, "I have a strong opinion, and I have a lot of feelings about it, but I think I can be fair and weigh everything equally."

In ruling against defendant's motion to excuse this prospective juror for cause, the trial court stated its conviction, which finds support in the record, that the prospective juror would follow the law and would set aside her personal views of the way the law ought to operate. Again, it is evident that the court found it necessary to ask the prospective juror questions to reach a decision about her, and doing so worked no unfairness to defendant.

(4) Prospective Juror No. 10 of October 5, 1994, held views similar to those of Prospective Juror No. 3 of that same day, and the trial court explained that the law would require her to consider mitigating and aggravating evidence. In response to further questions by the parties, she said that she would try to do as the court instructed. We see nothing improper in the court's explaining the law to the prospective juror, nor in its failing to engage in a similar dialogue with other prospective jurors whose voir dire did not give rise to the same concerns as did that of this prospective juror.

(5) John O. declared that after reading newspaper accounts he thought defendant was guilty of murdering O'Sullivan. He said "I don't think I would give him a fair chance, if I was on the jury" and "I would not want me on the jury if it was me [in defendant's shoes]." Despite his personal feelings about defendant, however, John O. agreed that criminal defendants should not be required to prove their innocence, that he would judge defendant based only on the evidence presented in court, and that if the prosecution presented insufficient evidence against defendant to find him guilty beyond a reasonable doubt, he would find him not guilty. The trial court then asked for further assurances that John O. would "judge the case based on the evidence that comes from that witness stand," and John O. replied that he could do so. Again, it is evident that the court found it necessary to question the prospective juror in order to reach a decision about his suitability to try the case, and doing so worked no unfairness to defendant.

As to the jurors under consideration, we see neither abuse of discretion in the way the trial court conducted voir dire nor any disparity in the standards it used to evaluate the prospective jurors' suitability for service, and we will not disturb its rulings on appeal.

We next address the two additional prospective jurors in question whom the prosecution challenged for cause and whom the trial court excused on that basis without asking any questions.

(1) Veronica R. stated, in answer to a question by defense counsel, that she opposed the death penalty and that her feelings had grown stronger with the passage of time. She also stated, however, that she could follow the law rather than her own personal views. When the prosecutor questioned her, she reverted to her view that "I don't feel it is my choice to take somebody's life. It is just the way I was brought up, my religion and background." She explained that God's law takes precedence over those of humankind and that a vote for the death penalty would be a violation of God's law. "I am Catholic and I don't think we should take a life," she affirmed.

Defense counsel attempted to rehabilitate Veronica R. She reaffirmed twice that "I'm against the death penalty," but that a case might exist in which she could vote for the greater sentence if "I . . . just block out everything how I feel." That did not satisfy the court, which stated, "I have just got to go by the entirety of the examination and demeanor of the [prospective] juror and call it, and this time I really don't think [she] can be fair and follow the law . . . ."

We see no impropriety in the trial court's conduct of voir dire of this prospective juror. It was obvious from Veronica R.'s voir dire that she was at least substantially impaired in her ability to follow the law and the court's instructions if the case reached a penalty phase—her religious scruples would take precedence over any secular rule. The court did not abuse its discretion either in the manner of conducting voir dire (i.e., failing to ask any questions of the prospective juror) or in its evaluation of the prospective juror's suitability for service, and we will not disturb its ruling on appeal.

(2) Like Veronica R., Prospective Juror No. 10 of October 6, 1994, declared, in answer to a question by defense counsel, "I'm against the death penalty." And like Veronica R., she also told defense counsel that she could follow the law rather than her own personal views. But then she reverted to her view that "I'm against the death penalty" and "it would be difficult to" impose it. She declared that she could not impose it in any case involving circumstances broadly similar to those present in the case against defendant. Thereafter she changed course again and said she could follow the law and consider imposing the death penalty. In response to the prosecutor, the prospective juror clarified her statements to defense counsel and declared that she could not impose capital punishment. She had written on her juror questionnaire that one of two "absolute" moral precepts is "not to take another's life," and at the time of voir dire she "could consider the evidence" at the penalty phase "for either one of those punishments" but having done so "could not agree to the death penalty" no matter what the evidence was. The trial court found that she could not follow the law and granted the motion to excuse her.

Again, we see no impropriety in the trial court's conduct of voir dire of this prospective juror. Plainly, this prospective juror was substantially impaired in her ability to follow the law and the court's instructions if the case reached a penalty phase—her moral opposition to the death penalty was close to absolute. The court did not abuse its discretion either in the manner of conducting voir dire (i.e., failing to ask any questions of the prospective juror) or in its evaluation of the prospective juror's suitability for service, and we will not disturb its ruling on appeal.

█ The foregoing discussion disposes of defendant's claim that the trial court imposed a differing standard in evaluating prospective jurors' qualifications and treated each group differently. Defendant invokes *People v. Champion* (1995) 9 Cal.4th 879 [39 Cal.Rptr.2d 547, 891 P.2d 93], for the principle that "trial courts should be evenhanded in their questions to prospective jurors during the 'death-qualification' portion of the voir dire, and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors." (*Id.* at pp. 908–909.) But the court followed the rule of *Champion* here. It evaluated each prospective juror individually and evenhandedly to reach a decision on the suitability of each for jury service. As noted, defendant contends that the trial court asked fewer questions of certain prospective jurors than of certain others, but in *People v. Navarette* (2003) 30 Cal.4th 458 [133 Cal.Rptr.2d 89, 66 P.3d 1182], we rejected a similar claim, commenting that "a numerical counting of questions . . . is not sufficient to establish a constitutional violation in this context." (*Id.* at p. 487.) A reviewing court should not require a trial court's questioning of each prospective juror in the *Witherspoon-Witt* context (*Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]; *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) to be similar in each case in which the court has questions, lest the court feel compelled to conduct a needlessly broad voir dire, receiving answers to questions it does not need to ask.

Accordingly, defendant's claim lacks merit.

### 4. *Testimony Regarding Defendant's Burglary Adjudication*

Defendant claims that the trial court erred in permitting the jury to learn that he was on juvenile probation for the felony offense of burglary when he committed the crimes for which he was being tried. He presents a guilt phase claim, which we discuss here, and a penalty phase claim, which we discuss in that section.

The prosecution theorized as follows: Defendant needed to steal a car without being detected, opportunistically robbed O'Sullivan of her vehicle, and murdered her so that she could not report the robbery to the police. In addition to needing the vehicle to abduct Stephanie C., defendant wished to avoid arrest for violating the probation he had been sentenced to by the juvenile court as a result of the automobile burglary. He needed time to flee the area, which he would gain by silencing O'Sullivan.

The prosecution asserted that introducing testimony about defendant's probationary status would buttress other testimony it planned to introduce, to the effect that he had made statements that he needed to leave the state to avoid arrest.

Defendant objected to the admission of any evidence about his probationary status as substantially more prejudicial than probative. (Evid. Code, § 352.) The trial court overruled the objection.

The parties then discussed the contours of the evidence to be admitted surrounding defendant's juvenile probation. Defendant objected that introducing evidence of the nature of the underlying offense would be improper, implicitly arguing that it would be substantially more prejudicial than probative, in violation of Evidence Code section 352 and irrelevant under Evidence Code section 350. The trial court disagreed, ruling the prosecution could present evidence that defendant had violated his probation and that he was on probation for a felony offense.

Thereafter, Michael L'Ecuyer, a Ventura County probation officer, testified before the jury that on June 30, 1993, defendant was on probation for a felony-level offense, namely burglary, that he explained defendant's terms of probation to him, including that he would be arrested for violating them, and that he set another appointment for him for July 15. When defendant failed to appear, L'Ecuyer petitioned the juvenile court for an arrest warrant. On cross-examination, defendant elicited testimony that L'Ecuyer believed defendant to be homeless, that defendant had transportation problems that made the required personal contact with probation authorities difficult, that defendant was under a minimum supervision status, and that his offense was for second degree burglary of an automobile.

Defendant's friend Dewaele and another witness, Robert Moore, testified that defendant told them he needed to leave town because of difficulties with the law. Dewaele testified defendant told him he was going to acquire a false identity "just to survive" and was leaving town "just to get away from things," including his probation officer and the police, and until "everything cooled down" with the officer. Moore testified defendant told him he wanted to "take off and be by myself . . . to get things figured out" because "he had a little problem with the law, a little minor thing . . . that he wanted to get . . . straightened out." Moore did not recall defendant saying anything about a burglary; rather, defendant said the "minor thing" "was about paying back on [an] auto accident." But Moore also said his memory of what defendant had said was imperfect.

Defendant asserts that permitting the jury to hear evidence that he was on probation for a felony offense violated Evidence Code section 352, i.e., introducing evidence of the felony nature of the juvenile adjudication was substantially more prejudicial than probative. We review for abuse of discretion a trial court's ruling on a motion to exclude evidence as substantially more prejudicial than probative. (*People v. Cox* (2003) 30 Cal.4th 916, 955 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

The evidence barred by Evidence Code section 352 is evidence that uniquely causes the jury to form an emotion-based bias against a party and that has very little bearing on the issues of the case. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070–1071 [56 Cal.Rptr.2d 133, 920 P.2d 1337].) Defendant argues that the maximum consequence for violating his probation was 30 days' confinement, and that was all the jury needed to know. Assuming for argument's sake that the precise nature of the conduct underlying defendant's juvenile adjudication carried a potential for prejudice outweighing its probative value, we conclude its admission was harmless. That defendant had a reason, in addition to his desire to abduct Stephanie C., for leaving the area—to avoid confinement on the probation violation—could be inferred from the testimony of Dewaele, Moore and L'Ecuyer, and the jury could find that reason to be probative of his intent in committing the capital offenses. In light of the circumstances of the capital offenses, the jury's awareness that defendant had committed an auto burglary as a juvenile could not have made a difference in the outcome of the case.

### 5. *Restricting Cross-examination of Prosecution Witness*

Defendant contends that the trial court erred in sustaining prosecution objections to evidence he wished to develop. Defendant also claims that the result deprived him of his right to confront the witnesses against him under the confrontation clause of the Sixth Amendment to the federal Constitution. Because he did not raise this claim before the trial court, he has forfeited it. (*People v. Partida* (2005) 37 Cal.4th 428, 435 [35 Cal.Rptr.3d 644, 122 P.3d 765]; *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365].) In any event, we see no reversible error.

As noted, eyewitness testimony suggested that about a mile from the pet store O'Sullivan was in the passenger seat of her vehicle, struggling with defendant. The witness to the struggle, Margaret Spalding, saw the vehicle swerving on the road as the two occupants, whom she could see but could not later identify, fought. The male occupant struck the female several times in her midriff as he tried to maintain control of the vehicle. The male appeared angry, the female frightened.

Defendant refers to three occasions on which the trial court sustained prosecution objections to questions defense counsel had asked of Spalding:

(1) In the course of a lengthy cross-examination of the witness, defendant tested Spalding's recollection. Defendant attempted to show that her recollection was clouded by other preoccupations in her life and the numerous errands she was running on the day she witnessed the altercation in the nearby vehicle. Spalding testified that "composing a letter" was one of the

distractions on the day she witnessed the altercation. Later, counsel asked, "Was this a letter to your son's therapist?" The prosecutor objected on relevance grounds and the trial court sustained the objection. Over defense argument that it wished to introduce evidence that Spalding was distracted by family problems at the time of the incident, the court ruled, "It's not the kind of thing that's going to [affect] recollection or perception. . . . The lady is entitled to her private life." The court also sustained an objection on relevance and asked-and-answered grounds a later question from defense counsel whether "other things" were troubling the witness on the day of the incident.

(2) Defense counsel asked Spalding if she once told the prosecutor's investigator that on the day of the incident she was "making some trips to and from Home Depot." The prosecution objected on grounds of hearsay not within any exception, and the trial court sustained the objection. Defense counsel did not dispute the ruling, but rephrased the question, asking the witness whether she remembered doing various activities on the day in question, and she replied that she did.

(3) Defense counsel asked Spalding if it appeared from the vehicle occupants' behavior that they knew each other. The prosecutor objected to the question as calling for speculation, and the trial court sustained the objection.

Turning to the specific objections made and sustained:

■ (1) In arguing that the trial court erred in excluding the nature of the letter Spalding was writing on the day she witnessed the struggle in O'Sullivan's vehicle, defendant relies on Evidence Code section 780, which provides, "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including . . . [¶] . . . [¶] (c) The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies." Evidence Code section 780, however, does not "say that all evidence of a collateral nature offered to attack the credibility of a witness would be admissible. Under Section 352, the court has substantial discretion to exclude collateral evidence. The effect of Section 780, therefore, is to change the present somewhat inflexible rule of exclusion to a rule of discretion to be exercised by the trial judge." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 780, p. 587; see *People v. Brown* (2003) 31 Cal.4th 518, 544–545 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) We review the court's ruling under the deferential standard of abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) The trial court did not abuse its discretion in ruling that the inquiry into the

nature of the letter Spalding was composing would have been of marginal relevance at best (cf. Evid. Code, § 350). (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

(2) As for counsel's inquiry whether Spalding told an investigator about trips to Home Depot, the People argue that this inquiry about her out-of-court statement plainly called for inadmissible hearsay, i.e., for "evidence of a statement . . . made other than by a witness while testifying at the hearing and . . . offered to prove the truth of the matter stated" (Evid. Code, § 1200, subd. (a)) and the objection was properly sustained. Defendant argues that he was merely attempting to refresh the witness's recollection.

Even if hearsay, "the reference was admissible to refresh [Spalding's] recollection" (*People v. Kennedy* (2005) 36 Cal.4th 595, 623 [31 Cal.Rptr.3d 160, 115 P.3d 472]; see *id.* at p. 622) and the trial court should have overruled the objection. Nevertheless, there was no reversible error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The case did not come close to hinging on the witness's ability to answer the question, and certainly there was no reasonable probability that if the witness had been able to answer it, the outcome would have differed. (*People v. Ayala* (2000) 23 Cal.4th 225, 271 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

■ (3) Defendant argues that counsel's inquiry about the vehicle's occupants called for an admissible lay opinion (Evid. Code, § 800). The trial court sustained the prosecutor's objection on the basis that the question called for a speculative answer. We review for an abuse of discretion a trial court's ruling that a question calls for speculation from a witness. (*People v. Marlow* (2004) 34 Cal.4th 131, 152 [17 Cal.Rptr.3d 825, 96 P.3d 126].) Under that deferential standard, we cannot second-guess the court's ruling that asking the witness whether she thought the two vehicle occupants were acting as if they knew each other was speculative. The court was implicitly ruling that the question called for a conjectural lay opinion. Such evidence would not be "[h]elpful to a clear understanding of [Spalding's] testimony." (Evid. Code, § 800, subd. (b).) The court's ruling did not fall outside the bounds of reason.

In sum, no reversible error occurred.

### 6. *Claims Regarding Defendant's Statements to His Grandmother*

Defendant claims that violations of his constitutional rights and Evidence Code section 352 occurred when the state arranged a conversation between him and his grandmother, Lois Thornton, at the police station following his extradition from Nevada but before he was charged with crimes against

O'Sullivan, Stephanie C., and Stephanie's mother. Defendant contends additional such violations occurred when the trial court denied his motions to exclude the dialogue from evidence. We disagree.[6]

On pretrial motions dated July 22, 1994, and October 13, 1994, defendant sought to exclude from evidence the tape and transcript of the conversation. In the first motion, he argued that his statements were obtained in violation of the Fifth Amendment's self-incrimination clause, the Sixth Amendment's guaranty of counsel, and the Fourteenth Amendment's guaranty of due process. In the second, he argued that introducing the material into evidence would violate Evidence Code section 352, which requires excluding evidence that is substantially more prejudicial than probative. The trial court denied each motion following hearings.

The hearing on the first motion produced the following evidence: As early as September 17, 1993, law enforcement suspected defendant of involvement in the disappearance of O'Sullivan and the kidnapping of Stephanie C. The principal investigator, Ventura County Sheriff's Department Sergeant Michael D. Barnes, initiated wide-ranging attempt-to-locate requests on September 18, 1993. On September 19, 1993, Sergeant Barnes and another detective drove to Lois Thornton's house in Oceano, California, to interview her. Lois Thornton agreed to help them find defendant.

On September 20, 1993, Sergeant Barnes learned that defendant had been arrested, Stephanie C. recovered, and O'Sullivan's vehicle found, all in Reno, and that defendant had been apprehended while possessing a gun. Sergeant Barnes flew to Reno and interviewed defendant for more than three hours. Defendant admitted stealing O'Sullivan's vehicle and kidnapping Stephanie C., but denied killing O'Sullivan. He admitted brandishing a gun when he kidnapped Stephanie C., but denied firing it, and also denied aiming it anywhere but at the sky. Sergeant Barnes returned to Ventura County on September 21, 1993, without defendant.

On September 22, 1993, counsel representing defendant, who remained in Nevada, told the Washoe County Justice Court that defendant, who was present in court, was invoking his rights to counsel and to remain silent "as to this case"—which was then an extradition proceeding—"and any other matter or cases or charges that are filed or pending or yet to be filed or pending as provided for under the 5th, 6th and 14th Amendments pursuant to *Miranda v. Arizona* and *McNeil v. Wisconsin*." At the same time, defendant's counsel

---

[6] Defendant also claims that the evidence was inadmissible character evidence. (Evid. Code, § 1101, subd. (a).) Because he did not raise this claim in the trial court, he has forfeited it. (*People v. Partida, supra*, 37 Cal.4th 428, 435.)

instructed defendant on the record not to speak with "anybody" in Nevada or California except in counsel's presence, and defendant said he would follow that instruction.

On September 26, 1993, Sergeant Barnes flew back to Reno to escort defendant back to Ventura County. On that same day, searchers located O'Sullivan's decomposed body in a remote section of Mulholland Drive in Los Angeles County. Also on that day, before leaving for Reno, and before learning of the searchers' discovery, Sergeant Barnes arranged for Lois Thornton to speak with defendant at the Ventura police station in a coordinated encounter soon after defendant's planned arrival time there in hopes of obtaining incriminating statements from him. Sergeant Barnes had made these arrangements because, despite not yet having found a body, his office continued to believe that defendant had killed O'Sullivan.

Thus, on September 26, 1993, Ventura County Sheriff's Deputy Susan Creede drove unannounced to Lois Thornton's house and offered to drive her to the station to meet with defendant, and Lois Thornton agreed. The police recorded and transcribed the conversation after advising Lois Thornton, but not defendant, that they would be monitoring their dialogue. According to their testimony, neither Sergeant Barnes nor Deputy Creede asked Lois Thornton to ask questions for them or otherwise act on their behalf. Barnes testified he never told Lois Thornton what to ask defendant, never made or tried to make an agreement regarding what he wanted her to do, and did not consider her a law enforcement agent. Lois Thornton, however, testified she believed Sergeant Barnes allowed her the special benefit of a contact visit with defendant because he wanted, through her efforts, to get information from defendant, and that her conversation with defendant was "implemented by suggestions" from the officers.

As Lois Thornton was speaking with defendant, the police interrupted and told her out of defendant's hearing that a body had been located that appeared to be O'Sullivan's. This was information they had learned earlier that day, but they withheld it from Lois Thornton until it appeared that mentioning it to her might cause her to elicit more information from defendant. The police mentioned the possibility that the body might contain bullets fired from defendant's gun. Lois Thornton testified that the police asked her to discuss the new information with defendant.

From the time of the police's initial contact with Lois Thornton that day, she was eager to learn as much as she could about the accusations against defendant. As she was being driven home after speaking with defendant, she said that if he was guilty of murder, she wanted the police to let her know. In addition, Sergeant Barnes testified that defendant thanked him for arranging his grandmother's visit.

The trial court denied the first motion, finding no constitutional violation "by this obvious ploy of setting up the interview between the Defendant and his grandmother . . . ." The court also denied the second motion, ruling that the evidence had probative value regarding defendant's state of mind and was relevant as to deliberation and intent.

As noted, during the conversation with Lois Thornton, defendant denied the murder, even as he commented to her, regarding O'Sullivan, "I don't care about her, I'm just tired." He also made a number of comments that showed consciousness of guilt of serious crimes, including fears of never leaving prison.

Arguing that Lois Thornton was manipulated into speaking with him, defendant contends the court erred in admitting the evidence. He focuses on the harm assertedly caused by introducing into evidence his extrajudicial statement referring to the murder victim: "I don't care about her, I'm just tired." He argues that during guilt phase closing argument the prosecution referred to this sentence to impugn him as a calculating killer, and returned to his statement during the penalty phase in support of a death sentence.

We find no Fifth, Sixth, or Fourteenth Amendment violation in the procedure by which the police obtained defendant's extrajudicial statements.

As is well known, *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] and its progeny apply to exclude certain evidence obtained during custodial interrogation. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 297 [64 L.Ed.2d 297, 100 S.Ct. 1682].) *Innis* explained that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Id.* at pp. 300–301, fns. omitted.)

Interrogation thus refers to questioning initiated by the police or its functional equivalent, not voluntary conversation. (*Rhode Island v. Innis, supra*, at pp. 298–300.) " 'Volunteered statements of any kind are not barred by the Fifth Amendment . . . .' " (*Id.* at p. 300, quoting *Miranda v. Arizona, supra*, 384 U.S. at p. 478.) The "functional equivalent" to express questioning involves police-initiated deceptive techniques designed to persuade or coerce a criminal defendant into making inculpatory statements. (*Innis, supra*, at p. 299.) The determination of whether an action is reasonably likely to elicit an incriminating response focuses primarily on the perceptions of the suspect, rather than the intent of the police. (*Id.* at p. 301.)

In *People v. Mayfield, supra,* 14 Cal.4th 668, the defendant argued that "the conduct of [a detective] in placing [the defendant's father] in the interview room alone with defendant was itself a form of custodial interrogation because it was conduct that was 'reasonably likely to elicit an incriminating response' [citation] from defendant." (*Id.* at p. 758.) We rejected the argument " 'because it is clear that defendant's conversations with his own visitors are not the constitutional equivalent of police interrogation.' [Citations.]" (*Ibid.*) Defendant here raises the same claim, asserting that the police conduct violated *Miranda v. Arizona, supra,* 384 U.S. 436, and *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880]. We reject it for the same reason.

We acknowledge certain factual distinctions between *Mayfield* and this case. In *Mayfield* we emphasized the defendant had "specifically and repeatedly asked to be allowed to speak with his father," whereas here the officers took the initiative in offering to bring, and bringing, Lois Thornton to talk with defendant. (*People v. Mayfield, supra,* 14 Cal.4th at p. 758.) In both cases, however, the defendants voluntarily engaged in conversation with close relatives. Here, moreover, Lois Thornton testified that she hoped her conversation with defendant would yield evidence to exculpate, not incriminate, him, and that her main purpose in visiting him was to provide emotional support. Defendant thanked Sergeant Barnes for arranging the encounter. The factual difference between the ways in which the conversations in *Mayfield* and this case were arranged do not compel a different conclusion in this case. There was no improper persuasion or coercion.

Our determination that the conversation between defendant and Lois Thornton did not constitute interrogation or its functional equivalent disposes of defendant's Fifth Amendment claim and obviates the need to address his related contention that Lois Thornton was acting as an unwitting or implied police agent.

Defendant's Sixth Amendment claim—that his right to counsel was violated when the police arranged to let his grandmother speak with him and thereby obtain inculpatory statements—also lacks merit. To be sure, "In *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], the high court held that once a judicial proceeding has been initiated against an accused and the Sixth Amendment right to counsel has attached, any statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against the defendant." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 66–67 [17 Cal.Rptr.3d 710, 96 P.3d 30]; see *Massiah v. United States* (1964) 377 U.S. 201, 205–207 [12 L.Ed.2d 246, 84 S.Ct. 1199]; *United States v. Gouveia* (1984) 467 U.S. 180, 187 [81 L.Ed.2d 146, 104 S.Ct. 2292].) The *Massiah* right, however, is offense-specific; that is, it applies only to " 'offenses as to which adversary judicial

criminal proceedings have been initiated'" (*People v. Slayton* (2001) 26 Cal.4th 1076, 1079 [112 Cal.Rptr.2d 561, 32 P.3d 1073]), such proceedings including " 'formal charge, preliminary hearing, indictment, information, or arraignment.' " (*Texas v. Cobb* (2002) 532 U.S. 162, 167–168 [149 L.Ed.2d 321, 121 S.Ct. 1335].) Because defendant had not been charged with any crimes stemming from his murder-kidnapping-assault crime spree at the time of the conversation, he cannot successfully invoke the Sixth Amendment guaranty. (*Cobb*, at p. 168.)

Next, defendant urges that permitting the introduction of his "I don't care about her" statement, referring to the murder victim, rendered the trial so fundamentally unfair as to violate the due process clause of the Fourteenth Amendment to the federal Constitution. We perceive no such unfairness. (See *People v. Sanders* (1995) 11 Cal.4th 475, 554, fn. 35 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Ashmus* (1991) 54 Cal.3d 932, 974–975, fn. 11 [2 Cal.Rptr.2d 112, 820 P.2d 214].) We also see no abuse of discretion under Evidence Code section 352 in admitting the evidence. (*People v. Cox, supra,* 30 Cal.4th 916, 955.) The trial court reasonably found that the statement was probative as tending to show defendant's deliberation and intent in committing the murder, and that its probative value substantially outweighed its prejudicial effect.

### 7. *Instructions Bearing on Special Circumstances*

Defendant claims that a series of instructional errors led to erroneous true findings on the special circumstances. We disagree.[7]

### a. *Modified Version of CALJIC No. 8.80*

Defendant's first claim of error involves a modified version of CALJIC No. 8.80 (1990 rev.). The court instructed the jury:

---

[7] Defendant also argues that the purported instructional errors discussed in this part had the additional legal consequences of violating various of his state and federal constitutional rights. It appears that defendant's instructional claims are the kind that required no trial court action to allow us to consider them. (§ 1259 [claims of instructional error may be entertained for the first time on appeal if they implicate a criminal defendant's substantial rights].) In such a case, or elsewhere when we discuss a situation in which defendant was required to take action below to preserve a claim here and did so, forfeiture is not at issue. In addition, when in this forum defendant makes constitutional arguments that do not invoke facts or legal standards different from those the court itself was asked to apply but merely assert that the court's action or omission had the additional legal consequence of violating the state or federal Constitution, his new constitutional arguments are not forfeited on appeal. In the latter instance, of course, rejection on the merits of a claim that the court erred on the issue actually before it necessarily leads to rejection of the constitutional gloss presented for the first time on appeal. No separate constitutional discussion is required in such a case, and we therefore provide none. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

"If you find the defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: robbery and/or kidnap.

"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

"*Where the special circumstance is based on robbery and/or kidnap, intent to kill need not be established as long as there is proof beyond a reasonable doubt that the defendant was the actual killer and the victim was killed in furtherance of the robbery or kidnap.*

"You must decide separately each special circumstance alleged in this case. If you cannot agree as to all of the special circumstances, but can agree as to one, you must make your finding as to the one upon which you do agree.

"In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously." (Italics added.)[8]

Defendant requested the third paragraph of the instruction. He now contends that the language he proposed was confusing because it could allow the jury, if it found the intent to kill, to find the special circumstances true without finding the killing was in furtherance of the underlying crime. Such a finding would be incorrect insofar as it would omit the requirement that the killing be in furtherance of an underlying crime, and would result in an incorrect finding on both special circumstances under the law at the time of the crimes (see § 190.2, former subd. (a)(17)(i), (ii) as amended by Prop. 11, added by voters, Primary Elec. (June 6, 1990); *People v. Riel* (2000) 22 Cal.4th 1153, 1201 [96 Cal.Rptr.2d 1, 998 P.2d 969]; cf. § 190.2, subd. (a)(17)(M), added by Stats. 1998, ch. 629, § 2; Prop. 18, approved by voters, Primary Elec. (Mar. 7, 2000) [as of effective date of initiative, i.e., Mar. 8, 2000, felony-murder-kidnapping special circumstance no longer requires killing be in furtherance of kidnapping as long as the defendant intended to kill]).

We first address respondent's claim of invited error. Defense counsel sought the instruction because he asserted it was "an exact quote" from *People v. Jennings* (1988) 46 Cal.3d 963, 979 [251 Cal.Rptr. 278, 760 P.2d 475], and *People v. Pock* (1993) 19 Cal.App.4th 1263, 1274 [23 Cal.Rptr.2d 900]. Counsel further asserted that the added paragraph would "give the

---

[8] We quote from the written version of the instructions. The jury was informed it would be given the written instructions to use during deliberations, and nothing in the record suggests that did not occur.

jurors some guidance. They get to know that the special circumstances is something different than just felony murder, that . . . a murder was committed in order to carry out or advance a commission of the crime . . . ." The trial court agreed with defense counsel, disagreed with the prosecution's objection that the language would confuse the jury, and added the paragraph we have italicized here to the instructions.

■ Although defense counsel exaggerated in stating the instructional language was an "exact" quotation of the language of *Jennings* and *Pock*, it did convey the essential holdings of those cases. *Jennings* stated, "A felony-murder special circumstance is established even absent intent to kill, premeditation, or deliberation, if there is proof beyond a reasonable doubt that the defendant personally killed the victim in the commission or attempted commission of, and in furtherance of, one of the felonies enumerated in subdivision (a)(17) of section 190.2." (*People v. Jennings, supra*, 46 Cal.3d 963, 979.) *Pock* stated, "Where a special circumstance is based upon one of the requisite felony-murder provisions, intent to kill need not be established as long as there is proof beyond a reasonable doubt that the person killed the victim in furtherance of the felony." (*People v. Pock, supra*, 19 Cal.App.4th 1263, 1274.)

■ " 'The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a "conscious and deliberate tactical choice" to "request" the instruction.' [Citations.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 970 [111 Cal.Rptr.2d 2, 29 P.3d 103].) Accordingly, defendant may not complain on appeal about the giving of the modified version of CALJIC No. 8.80.

■ Were we to address the merits, we would find no error. As noted, defendant claims under California law that the instruction created ambiguity. When presented with such a claim, we review the challenged language to inquire whether there is a reasonable likelihood that the instruction caused the jury to misconstrue or misapply the law. (*People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Doing so, we find no such reasonable likelihood. The instruction correctly stated the law. (*People v. Jennings, supra*, 46 Cal.3d 963, 979; see *People v. Dennis* (1998) 17 Cal.4th 468, 516 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) It informed the jury that in the felony-murder context, even if intent to kill was not established, the jury should nonetheless find the special circumstance true if it found beyond a reasonable doubt that defendant was the actual killer and that he killed in furtherance of

the underlying crime. Moreover, any possible confusion on the part of the jury was eliminated by the giving of CALJIC No. 8.81.17 with respect to both the kidnapping and the robbery special circumstances. That instruction informed the jury that to find the special circumstance allegations true, it must find that the murder was committed while the defendant was engaged in the commission or attempted commission of the specified felony, or during the immediate flight thereafter, and was committed in order to carry out or advance the commission of the crime, to facilitate the escape therefrom, or to avoid detection, and that the special circumstance is not established if the felony was merely incidental to the murder. The jury therefore could not have found the special circumstances true had it not been persuaded beyond a reasonable doubt that the murder was committed in furtherance of the kidnapping and robbery. Defendant's claim lacks merit.

### b. *Instructions on Consciousness of Guilt*

Next, defendant contends that because he conceded guilt of felony murder, disputing only the truth of the felony-murder special circumstances, it was error to instruct the jury that it could consider the evidence of his false statements and his attempts to hide evidence as showing consciousness of guilt. Defendant theorizes that the instructions improperly allowed the jury to consider evidence of acts showing consciousness of guilt as also amounting to evidence of his state of mind at the time of the murder of O'Sullivan, i.e., that he killed her in furtherance of robbery and kidnapping. Again, we disagree.

Preliminarily, we cannot accept defendant's premise that because he conceded his guilt of felony murder, as to homicide the trial should have been limited to resolving the truth of the special circumstance allegations. In view of defendant's not guilty plea, the prosecution was required to prove beyond a reasonable doubt each material fact of the crimes charged. "[T]he fact remained that defendant did not plead guilty to any of the charges and the jury had before it the issue of guilt on all the charges." (*People v. Breaux* (1991) 1 Cal.4th 281, 304 [3 Cal.Rptr.2d 81, 821 P.2d 585]; see *People v. Rowland* (1992) 4 Cal.4th 238, 260 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Thus, the trial court was required to instruct the jury on all issues.

The court gave the jury three instructions regarding consciousness of guilt. First: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to

prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination." (See CALJIC No. 2.03 (5th ed. 1988).) Second: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration." (See CALJIC No. 2.06 (5th ed. 1988).) Third: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (See CALJIC No. 2.52 (5th ed. 1988).)

 Defendant's claim is without merit. "The cautionary nature of the instructions [discussing CALJIC Nos. 2.03 and 2.06] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1994) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Moreover, whenever the prosecution properly relies on evidence of consciousness of guilt, relevant instructions must be given. (See *People v. Turner* (1990) 50 Cal.3d 668, 694 [268 Cal.Rptr. 706, 789 P.2d 887] [discussing CALJIC No. 2.52].) We have rejected claims that consciousness-of-guilt instructions permit the trier of fact improperly to draw inferences about a defendant's state of mind. (*People v. Bolin* (1998) 18 Cal.4th 297, 327 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

Defendant further argues that because his identity was not at issue the consciousness-of-guilt instructions were improper. He is incorrect. Instructions on consciousness of guilt are proper not only when identity is at issue, but also when "the accused admits some or all of the charged conduct, merely disputing its criminal implications." (*People v. Turner, supra,* 50 Cal.3d 668, 694, fn. 10 [discussing CALJIC No. 2.52 and addressing circumstances in which the prosecution theorized defendant intentionally murdered and robbed, and defendant admitted killing but claimed doing so in self-defense with no intent to kill, and denied intending to steal from the victim].)

Also without merit is defendant's complaint that the trial court erred in giving his specially requested consciousness-of-guilt instruction only after modifying it by adding the word *necessarily*. The court's action resulted in the jury receiving the following instruction: "As used in these instructions, consciousness of guilt means consciousness of some wrongdoing, and does not necessarily refer to consciousness of having committed the specific

offenses charged." This was an accurate statement of the law. " 'A reasonable juror would understand "consciousness of guilt" to mean "consciousness of some wrongdoing" rather than "consciousness of having committed the specific offense charged." ' " (*People v. Bolin, supra,* 18 Cal.4th 297, 327.) But because "some wrongdoing" could include a specific offense, the instruction, as modified by the court, accurately stated the law. (*Ibid.*) But evidence of consciousness of guilt may be significant, even if it is not sufficient to establish guilt, and must not be understood as being tantamount to a confession to a specific crime. It may be evidence tending to prove, in light of all of the evidence the trier of fact hears, that a criminal defendant knew he or she committed a crime. Hence the court's inclusion of the word *necessarily* was proper.

Defendant also complains of the trial court's refusal to give this special instruction, which he requested: "The defendant's consciousness of guilt, if any, is relevant upon the questions of whether defendant was afraid of being apprehended or whether the defendant thought he had committed a crime. *Consciousness of guilt may not be considered in determining the nature or the degree of the crime.*" (Italics added.) Defendant focuses on error he perceives in the court's unwillingness to provide the jury with the "nature or degree" language in the italicized sentence. We recently rejected a similar claim (*People v. Jurado* (2006) 38 Cal.4th 72, 125 [41 Cal.Rptr.3d 319, 131 P.3d 400]), and see no reason to reconsider our view.

### c. *Instruction on Motive*

Defendant next argues that the jury should not have been instructed, "Motive is not an element of the crime charged and need not be shown." (CALJIC No. 2.51 (5th ed. 1988).) He contends that the jury could have applied this rule to the special circumstance allegations. We disagree. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1027 [254 Cal.Rptr. 586, 766 P.2d 1]; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

### d. *Instruction on Concurrence of Act and Intent*

Defendant next argues that the following instruction was flawed because it failed to refer to the special circumstance allegations: "In the crimes and allegations charged in Counts 2, 3, 4, 8, 9, 10, 11, 12 and 13 there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator," and otherwise "the crime or allegation to which it relates is not committed." (See CALJIC No. 3.31 (1992 rev.).)

The special circumstance allegations were considered by the jury in connection with count 1, the murder count, which the instruction did not list. Defendant contends that the jury may have concluded that it need not consider whether a union of act and intent was required to find the special circumstances true. He is incorrect. To be sure, concurrence of act and intent is required to find true a special circumstance allegation. (See *People v. Dickey* (2005) 35 Cal.4th 884, 904–905 [28 Cal.Rptr.3d 647, 111 P.3d 921].) The instruction given to the jury said nothing about the crimes and allegations charged in count 1, and, in light of a more specific instruction that referred to count 1, we presume that the jury did not draw any conclusion about count 1 from the modified version of CALJIC No. 3.31. The jury presumably followed the specific instruction, under which it was instructed that to find the special circumstance allegations true it must find: "The murder was committed in order to carry out or advance the commission of the [underlying crime] or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [underlying crime] was merely incidental to the commission of the murder." (See CALJIC No. 8.81.17 (1991 rev.).) CALJIC No. 8.81.17 by itself made clear the required concurrence of conduct and intent at the time of the capital crime. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1144 [36 Cal.Rptr.2d 235, 885 P.2d 1] [relying on the giving of CALJIC No. 8.81.17 and, with respect to the underlying crimes only, CALJIC No. 3.31].)

### 8. *Instructions on Assault with a Deadly Weapon*

Defendant argues that improperly given instructions lowered below the beyond-a-reasonable-doubt standard the prosecution's burden of proof on the charge of assault with a firearm (§ 245, subd. (a)(2)), a general intent crime (*People v. Colantuono* (1994) 7 Cal.4th 206, 214 [26 Cal.Rptr.2d 908, 865 P.2d 704]), on Linda C., Stephanie C.'s mother. We disagree.

In addition to arguments we rejected in the previous section, defendant argues that the trial court erred in giving circumstantial evidence instructions. He maintains in essence that the court should have included sua sponte the assault with a deadly weapon count when giving a version of CALJIC No. 2.02 but failed to do so, omitting that count and instead, with regard to it, instructing on circumstantial evidence with CALJIC No. 2.01.

██ "CALJIC No. 2.01 . . . instructs on the sufficiency of circumstantial evidence to prove a defendant's guilt," whereas "CALJIC No. 2.02 . . . instructs more specifically on the sufficiency of circumstantial evidence to prove a defendant's specific intent or mental state." (*People v. Rodrigues, supra,* 8 Cal.4th 1060, 1141.) "[T]here is no need to give CALJIC No. 2.02 when the trial court gives a more inclusive instruction based upon CALJIC

No. 2.01, unless the only element of the offense that rests substantially or entirely upon circumstantial evidence is that of specific intent or mental state." (*People v. Hughes* (2002) 27 Cal.4th 287, 347 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

Defendant asserts that, notwithstanding the first quoted part of *Hughes*, he was entitled to a sua sponte instruction that included the assault with a deadly weapon count in the CALJIC No. 2.02-based instruction due to the exact nature of the evidence in this case. We need not resolve this question. "Because the trial court delivered the more inclusive instruction under CALJIC No. 2.01, its refusal to additionally instruct with CALJIC No. 2.02 was not prejudicial error." (*People v. Rodrigues, supra,* 8 Cal.4th 1060, 1142.)

### B. *Penalty Phase Issues*

#### 1. *Testimony Regarding Defendant's Burglary Adjudication*

At the penalty phase, at defendant's request, the court instructed the jury that it could not consider his juvenile burglary adjudication as a felony conviction aggravating factor (§ 190.3, factor (c)). The prosecution referred to the matter in closing argument, telling the jury that the burglary could not be considered in aggravation. Defendant maintains that this was a rhetorical device designed to remind the jurors of the burglary even while ostensibly urging them not to consider it. He contends that the prosecutor's remarks show an additional improper effect of the trial court's guilt phase ruling permitting Michael L'Ecuyer, the Ventura County probation officer, to testify that he was on probation for a juvenile felony adjudication. The guilt phase ruling, in his view, caused a violation of the Eighth and Fourteenth Amendments to the federal Constitution.

We discern no violation of defendant's constitutional rights. The jury was instructed not to consider the burglary in aggravation, and we assume that the jury followed the instructions the trial court gave it. In addition, the jury was instructed that the prosecution was relying on evidence solely of 16 enumerated "criminal acts" in aggravation and that the jury "may not consider any evidence of any other criminal activity as an aggravating circumstance."

Even if the prosecutor's remarks invited the jury to consider defendant's prior misconduct, the instructions would prevail. "We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Clair, supra,* 2 Cal.4th 629, 663, fn. 8.)

## 2. *Ruling Against Playing Videotape to Jury*

Defendant argues that the trial court erred in excluding as hearsay a videotape that he wished to introduce in mitigation. As mentioned, defendant introduced evidence at the penalty phase that he was classified as learning-disabled during his school years. He wished to introduce into evidence and play to the jury a videotape in which one Dr. Richard D. Lavoie (the record does not reveal his profession) lectures on learning disabilities to what the prosecution described as "a panel of persons consisting of such people as parents and school psychologists."

The prosecution moved in writing to exclude the 70-minute-long videotape as hearsay evidence. It explained to the trial court that in the recording "Dr. Lavoie expresses some rather strong and arguably extreme view points in which he contends in essence that learning disability kids are not taught appropriately or [are] treated in a cruel, mean and insensitive manner by teachers . . . and states for example that some of this type of conduct and treatment is in fact the norm. He impersonates teachers to show how they are mean to learning disability children (whether intentionally and/or unintentionally). [¶] He contends learning disability children are taught by teachers who do not understand them or know how to deal with their learning disability problems. [¶] . . . [¶] At the very end of the video tape there are a few brief comments by others although the tape consists mostly of his lectures and demonstrations to a panel of persons."

The prosecution continued, "To present the video tape would be simply to allow the defense to present a witness—Dr. Lavoie—to put forth some very controversial opinions based on a number of extremely dubious assumptions. (Apparently Dr. Lavoie believes that teachers of special education children do an incompetent job in many or most, if not all, cases.)"

At a hearing on the prosecution's motion, defendant replied that "we're not proposing to play the entire videotape, but there are about 30 minutes where [Dr. Lavoie] gives examples of how some of the specific learning disabilities [cause the afflicted person to] view a certain situation . . . and how that learning disability makes it difficult for that person to perform in a classroom and what the reaction is to that failure to perceive." In defendant's view, the jury would see "a demonstration of a classroom-like situation with a person who . . . is made to appear to have a learning disability" and the tape would not be hearsay any more than, in place of having "an expert [testifying] . . . how a crane" functions "you . . . have a videotape showing how a crane

works." Defendant argued that such a demonstration is "not subject to cross-examination. It's merely illustration. It doesn't give any kind of concrete information." Without viewing the videotape, the trial court ruled that its content was hearsay not subject to any exception, and excluded it. Defendant maintains on appeal that the trial court erred, under state evidentiary law and the Eighth and Fourteenth Amendments to the federal Constitution, in excluding the evidence as hearsay.

Because "[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct" (*People v. Partida, supra,* 37 Cal.4th 428, 435), the constitutional claims are, in all but one instance, forfeited (*ibid.*). The sole exception is defendant's due process claim, for it merely asserts that the trial court's ruling, insofar as wrong on grounds actually presented to that court, had the additional legal consequence of violating the Constitution. To that extent, defendant's constitutional argument is not forfeited on appeal. (See *id.* at pp. 433–439.)

We find no state law error, and no due process violation. Attempting to play in court "assertions" and "descriptions" previously recorded on videotape or a similar medium constitutes an attempt to introduce hearsay evidence. (*People v. Jurado, supra,* 38 Cal.4th 72, 129; accord, *People v. Monterroso* (2004) 34 Cal.4th 743, 779 [22 Cal.Rptr.3d 1, 101 P.3d 956].) The trial court did not need to view the recording, because defendant's own description of its content at the hearing on the prosecution's motion established that the statements and dramatizations therein were being offered for the truth of the matter asserted (Evid. Code, § 1200, subd. (a))—they would present Dr. Lavoie's view of how learning-disabled students and the teachers of such students tend to react in certain situations. As such, the videotaped content was inadmissible. (*Id.,* subd. (b).) Nor did defendant offer any possible exception under which the content might be introduced—his example involving the operation of a crane made plain that the videotape's content would be a substitute for testimony, but without any opportunity for cross-examination.

Defendant's due process claim that the ruling denied him his constitutional right to present a defense also lacks merit. Ordinarily a criminal defendant's attempt "to inflate garden-variety evidentiary questions into constitutional ones [will prove] unpersuasive. 'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

There was no constitutional violation here. The videotape would have been hearsay not subject to cross-examination in violation of the Evidence Code. The court's ruling did not prevent defendant from presenting evidence consistent with the normal rules of evidence through live witnesses who are subject to cross-examination.

### 3. *Excluding Other Items of Proposed Mitigating Evidence*

Defendant claims that the trial court erred under state law and acted unconstitutionally by ruling against defendant on several occasions in which he sought to introduce mitigating evidence. He did not invoke constitutional guaranties at trial and has forfeited his constitutional claims (*People v. Partida, supra*, 37 Cal.4th 428, 435) on appeal, except for his due process claim (*id.* at pp. 433–439).

We turn to each item of evidence at issue.

### a. *Steve Miller's Alleged Drug Use and Violent Reputation*

The trial court sustained, on relevance grounds, the prosecutor's objections to questions about the types of drugs Steve Miller abused and Miller's reputation for violence. As will be recalled, Miller was defendant's biological father. Miller died when defendant was four years old, having seen little of him since his birth. There was little connection between the two individuals.

Defendant's mother testified that Miller abused drugs. She was describing conduct that Miller apparently engaged in before defendant's birth. Defense counsel inquired, "What types of drugs was Steve taking while you were dating him?" The prosecution objected to the question on relevance grounds, and the trial court sustained the objection.

We review a trial court's ruling excluding evidence on grounds of irrelevance (Evid. Code, § 350) for abuse of discretion. " ' "The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1166–1167 [32 Cal.Rptr.3d 759, 117 P.3d 476].) The court acted within its discretion in concluding that evidence of the precise nature of the substances consumed, apparently before defendant's birth, by a figure who played essentially no role in defendant's upbringing, did not have "any tendency in reason to prove or disprove any disputed fact that is of

consequence to the determination of the action" (Evid. Code, § 210); i.e., it was irrelevant to the sentence that defendant should receive. Excluding irrelevant evidence did not deprive defendant of his right to present a defense. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 996–997 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

We turn to defendant's next claim, regarding exclusion of reputation evidence. Danny Montgomery testified briefly for the defense. He stated that he worked in a bar in his late teens, and met Markita Thornton, defendant's mother, who worked for the same employer as a coat checker. She was about two years younger than Montgomery. Montgomery testified that he would acquire illegal drugs and provide one type, "reds," to Markita Thornton. Defense counsel asked Montgomery if he had ever met Steve Miller, and he replied no. Counsel then asked, "Did you know him by reputation?" and Montgomery replied yes. Counsel asked, "What was his reputation?" The prosecution objected on grounds of relevance and hearsay. The trial court noted that Miller was not a party or a witness and sustained the objection on relevance grounds.

On appeal, defendant argues that the question did not call for irrelevant evidence. Respondent comments that the question was vague and, although the jury already knew that Miller had been a violent man, counsel could have been seeking an answer based on Miller's reputation for anything.

Defendant's claim is without merit. The trial court did not abuse its discretion in sustaining the objection, nor was there any due process viola-tion. As stated, the links between defendant and Miller were attenuated— defendant had seldom met his biological father, their approximately seven encounters occurred when defendant was very young, and Miller died when defendant was four. In essence, defendant had no ties to Miller. Under those circumstances, the court could reasonably rule that Miller's reputation in the community was not relevant to the penalty that defendant should receive.

### b. *Psychiatrist's Report to an Attorney That Defendant Had an Attention Deficit Disorder*

Defendant claims that the trial court erred in sustaining the prosecution's objection to evidence in a psychiatrist's report that his mother was aware, from the time defendant was a young child, that he had been diagnosed with an attention deficit disorder.

As noted, a psychiatrist, Dr. Jacks, treated defendant following a dog bite. Dr. Jacks's treatment lasted for a year and a half and began in January of 1980. Dr. Jacks diagnosed defendant with, among other syndromes, ADHD.

On two occasions in September of 1981, soon after discontinuing treatment with Dr. Jacks, defendant saw another psychiatrist, Robert A. Solow, M.D., who was deceased at the time of trial. On September 25, 1981, Dr. Solow wrote a diagnostic report to an attorney in which he opined that defendant "did suffer a post-traumatic stress disorder after being bitten by the dog. . . . [¶] It is my opinion that this condition has become ameliorated so that Mark at the present time has returned to his basic pre-morbid personality and condition which probably was an attention deficit disorder."

Defense counsel attempted to have Markita Thornton, defendant's mother, testify about the content of Dr. Solow's report, which the witness had in her hand in the witness chair.[9] The prosecution objected without stating a basis. Defense counsel interpreted the objection as resting on hearsay grounds and argued that the report was not being offered for the truth of the allegation that defendant had a psychological impairment in 1981, but rather for the witness's state of mind, i.e., Markita Thornton's knowledge of the report's content. "I'm not offering this for the truth that he had attention deficit, merely that she was aware of that and the school should have been aware of it as well," counsel explained. In other words, counsel intended to offer evidence to buttress the defense theory, which would later be fleshed out through the testimony of Carol Horwich Luber, that many of defendant's problems stemmed from inadequate attention the school paid to his needs during his formative years. Counsel offered to accept a limiting instruction to the jury that it was not to consider the report's contents as evidence that defendant had an attention deficit disorder in 1981.

The trial court asked what the relevance of the evidence would be if it were not offered for the truth of its contents, and defense counsel again stated the question was meant to adduce evidence of the witness's state of mind, i.e., she had been alerted to the psychiatrist's conclusion that her son had a

---

[9] Defense counsel questioned Markita Thornton as follows:

"When Mark [defendant] was seeing Dr. Jacks in 1980, did Dr. Jacks tell you that he felt Mark was having significant emotional problems?

"Yes.

"Did he also tell you that he felt Mark had a[n] attention deficit disorder?

"Yes, he did.

"Did he inform the school of that?

"I told them he had problems. I had it in reports that I had given to them, I assume.

"And did Mark also see Dr. Solow in regard to the dog bite in 1981?

"Yes.

"And did Dr. Solow give you a report?

"Yes, he did.

"And did you give that report to us . . . ?

"Yes, I did. [¶] . . . [¶]

"And on page 8 at the bottom, does it refer to attention deficit in the report?

"[The prosecutor]: Objection to the report being read in court."

psychological problem. Ultimately, the court sustained the objection, without specifying the precise ground.

 " ' "Whenever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned." ' " (*People v. Duran* (1976) 16 Cal.3d 282, 295 [127 Cal.Rptr. 618, 545 P.2d 1322], italics omitted.) Such evidence is not hearsay. (*People v. Lo Cicero* (1969) 71 Cal.2d 1186, 1189–1190 [80 Cal.Rptr. 913, 459 P.2d 241].) But the trial court was concerned with more than hearsay. It asked about relevance and did not specify the ground on which it ruled. On this record, it is more likely that it ruled on the basis of the proffered evidence's relevance than on its hearsay or nonhearsay character. The court's question was directed to the evidence's relevance, and the court did not ask about or mention hearsay.

The trial court did not abuse its discretion in excluding the evidence. (*People v. Carter, supra*, 36 Cal.4th 1114, 1166–1167.) Defendant had already presented evidence that his mother, on learning of Dr. Jacks's evaluation of him, knew of his attention deficit disorder (and had alerted defendant's school). Once the evidence that Dr. Jacks had alerted her to defendant's infirmity was introduced, further testimony that the report of another psychiatrist, Dr. Solow, later alerted Markita Thornton to defendant's condition would not have been "of consequence to the determination of the action" (Evid. Code, § 210).

### c. *Evidence Defendant's Stepfather Beat His Mother Outside Defendant's Presence*

Defendant claims that the trial court erred in sustaining, on relevance grounds, the prosecution's objections to evidence that his stepfather, Pierre Sarrazin, struck Markita Thornton, his mother, on occasions when defendant was not present, allowing evidence only of the incidents when he was present.

Sarrazin, Markita Thornton's husband at the time of trial, was called as defendant's witness. He testified that he hit Markita Thornton on five distinct occasions. Defense counsel asked about the second occasion on which the violence occurred, and the prosecution objected on grounds of lack of foundation and irrelevance. The prosecutor explained that defendant was not present at the time. The trial court agreed that under those circumstances the evidence was irrelevant and sustained the objection on that ground. It rejected defense counsel's argument that in her opinion spousal abuse affects children in a household who are being raised there whether or not they are aware of

particular incidents. Shortly afterward, the court sustained a relevance objection to another question that asked Sarrazin about a hitting episode when defendant was home but did not hear or see it. It rejected defense counsel's argument that, also in her opinion, an incident of spousal abuse affects children who are home at the time regardless of whether they witness it.

Despite these two rulings, defendant was able to introduce considerable evidence of Sarrazin's violence toward Markita Thornton. Sarrazin candidly described two of the five incidents in detail and explained that they arose from disputes over drugs. He also testified about a third incident without prosecution objection even though the record is not clear that defendant was present. Sarrazin also admitted striking defendant on one occasion when defendant was 17 years old.

Defendant argues that the excluded evidence of the two incidents was relevant because such episodes generate negative effects on a child whether or not the child observes them. " 'Studies show that violence by one parent against another harms children even if they do not witness it.' " (*In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562 [64 Cal.Rptr.2d 93], quoting Fields, *The Impact of Spouse Abuse on Children and Its Relevance In Custody and Visitation Decisions in New York State* (1994) 3 Cornell J.L. & Pub. Pol'y. 221, 228.) At trial, however, defendant presented no independent authority for the view he now expresses. Counsel simply ventured her own opinion that living in a household in which abuse occurred affected defendant even if he did not observe it, and even if he was not in the house at the time. Counsel made no offer of proof, did not attempt to lay any factual foundation for the view she expressed, and was not speaking on a subject on which judicial notice could be taken. This was insufficient to establish the relevance of the evidence. The trial court was not required to accept counsel's mere speculation about the psychological consequences of spousal violence in ruling on the proffered evidence's relevance. (See *People v. Diaz* (1992) 3 Cal.4th 495, 552 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (lead opn. of Kennard, J.); accord, *id.* at pp. 576–577 (conc. opn. of Panelli, J.); *People v. Medina* (1990) 51 Cal.3d 870, 890 [274 Cal.Rptr. 849, 799 P.2d 1282].) We find no abuse of discretion.

### d. *Opinion of Defendant's Pediatrician Regarding Canada Trip*

Defendant claims that the trial court erred in sustaining, on relevance grounds, the prosecution's objections to the testimony of his pediatrician that his academic development was set back by a long trip to Canada the family took when he was in fifth grade, causing him to leave school on March 31, 1986.

As described, defendant's pediatrician, Carter R. Wright, M.D., testified on defendant's behalf, explaining that defendant would not breast-feed and failed to gain weight normally. Undertaking direct examination of Dr. Wright on later events in defendant's life, defense counsel asked broadly, "What were you[r] impression[s]?" about the then pending trip to Canada and, more narrowly, "Did you have some sense of whether . . . this was a well-planned out trip to Canada?" and "Did Markita tell you whether she was planning to stay in Canada or just visit?" The prosecutor objected to all three questions on the ground that they were irrelevant and did not call for a medical opinion. He also objected to the third question on hearsay grounds. After the third question, the trial court asked counsel for the purpose of the proffered testimony. Defense counsel argued that the questions called for admissible testimony about "his observation of the . . . instability in the family and this plan that they had." The court, which had already sustained objections to the first two questions, sustained the objection to the third as well. It appears that the court's rulings were based on the irrelevance of the proffered evidence.

On appeal, defendant states that he intended to prove that the trip to Canada disrupted his education and harmed his later performance in school, setbacks that could have generated sympathy among the jurors. He argues that the testimony would have been admissible as an expert medical opinion and a proper lay opinion, and that it was relevant as mitigating evidence.

Defendant's claim that the trial court improperly failed to allow Dr. Wright's expert medical testimony is without merit. "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801.) Counsel's questions of Dr. Wright did not call for a expert opinion. Counsel asked Dr. Wright about his "impressions" and his "sense" about the pending trip to Canada, and explained to the court that counsel was seeking Dr. Wright's "observation." These questions were not directed toward medical expertise. Accordingly, the trial court did not abuse its discretion (see *People v. Pollock* (2004) 32 Cal.4th 1153, 1172 [13 Cal.Rptr.3d 34, 89 P.3d 353]) in ruling that the questions did not call for an expert medical opinion.

Nor did the trial court abuse its discretion (*People v. Carter, supra*, 36 Cal.4th 1114, 1166–1167) in ruling that the questions were irrelevant insofar as they called for Dr. Wright's lay opinion, i.e., the answers would not have been "[h]elpful to a clear understanding of his testimony" (Evid. Code,

§ 800), and would not have had "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210). As a lay witness, testimony from Dr. Wright that a trip to Canada must have been disruptive to defendant's educational development would have amounted to little more than conjecture, and would not have been helpful to understand his testimony about defendant's childhood difficulties. We cannot say that the court was unreasonable in concluding that counsel's questions called for irrelevant answers. We find no basis to disturb its rulings.

### e. *Erika S.'s Correspondence*

Defendant claims that the trial court erred in sustaining, on grounds of cumulativeness, the prosecution's objection to the introduction of a number of letters Erika S. wrote to him.

As noted, in cross-examining Erika S. at the guilt phase, defendant elicited testimony that their relationship was affectionate as well as tumultuous. The jury saw photographic evidence of this and heard passages from two love letters Erika S. sent to defendant. The two letters were received into evidence. Erika S. also testified that at the time she wrote them she was passionate about defendant.

During the penalty phase, defendant sought to introduce into evidence 17 love letters written by Erika S., 16 of them to him and one to a third party named Russell in which she said she thought defendant was attractive. The prosecutor objected, arguing that the letters were "cumulative evidence on a nonissue"; "it's a nonissue that she loved him." The prosecutor clarified thereafter that his objection regarding the letters to defendant rested on cumulativeness (see Evid. Code, § 352); the objection to the letter to Russell rested on relevance (*id.*, § 350). Defense counsel noted that the jury had heard evidence of defendant's violent and threatening conduct toward Erika S. around the time of the high school homecoming dance of October 10, 1992, and said that counsel wanted to remind the jury of the context of the relationship. The court asked, "Hasn't she stated all this on the stand already?" and counsel conceded that the witness had, but argued in effect that the letters would flesh out the testimony. The court excluded the letters as cumulative in light of Erika S.'s prior testimony.

On appeal, defendant contends the court erred in excluding the letters. However, we will normally not second-guess a trial court's ruling under Evidence Code section 352. (*People v. Valdez* (2004) 32 Cal.4th 73, 109 [8 Cal.Rptr.3d 271, 82 P.3d 296].) In light of Erika S.'s own testimony, the trial court could reasonably have excluded the letters as cumulative.

Defendant also argues that the trial court should not be permitted to rule against admitting the love letters simply because the prosecution said it did not dispute the evidence (and presumably would be willing to stipulate) that Erika S. loved him. (See *Old Chief v. United States* (1997) 519 U.S. 172, 186–189 [136 L.Ed.2d 574, 117 S.Ct. 644].) However, the court did not do so. It excluded the evidence solely on the ground that the evidence was cumulative under Evidence Code section 352.

### f. *Markita Thornton's Suicide Attempt Shortly Before the Crimes*

Defendant claims that the trial court erred in sustaining, on relevance grounds, the prosecution's objections to the testimony of Sydnie Goldfarb that defendant's sister Chantal was upset by their mother's suicide attempt. In April 1993, about five months before defendant committed his crimes, his mother, Markita Thornton, attempted suicide. Sydnie Goldfarb, an acquaintance who was studying to become a marriage and family counselor, went to defendant's house and found defendant crying and his sister distraught.

Defendant asserts error because the jury was not allowed to learn whether Chantal was upset by Markita Thornton's suicide attempt. The court permitted the witness to testify that defendant was "very distraught and he was crying," but it sustained a relevance objection to a question whether Chantal was also upset. We see no abuse of discretion. (*People v. Carter, supra,* 36 Cal.4th 1114, 1166–1167.) The court's ruling that it was irrelevant whether Chantal was upset by Markita Thornton's suicide attempt did not fall outside the bounds of reason. We cannot say the court was unreasonable in concluding that the emotional impact of the suicide attempt on someone other than defendant was not "of consequence." (Evid. Code, § 210.)

Defendant also claims error in the trial court's sustaining objections on relevance grounds to questions about (1) where Sydnie Goldfarb took Chantal following the suicide attempt, and (2) Chantal's whereabouts when the police arrived in response to the attempt. We find these rulings also within the court's discretion. We cannot say that the court was unreasonable in concluding that where Goldfarb may have taken Chantal and Chantal's exact location (the jury already knew she was present) when the police arrived following the suicide attempt was not "of consequence" to the sentence defendant should receive for murdering Kellie O'Sullivan.

### g. *Defendant's Requests That the Siy Family Adopt Him*

Defendant claims that the trial court erred in sustaining, on relevance grounds, the prosecution's objection to a question defense counsel put to

Berta Siy about her response to defendant's request that the Siy family adopt him. As noted, when defendant was 16 years old and in 10th grade, he lived with the family of Berta Siy on weekdays in order to be eligible to spend the 1990–1991 academic year at Hoover High School. He liked the Siys and asked the Siy family to adopt him.

On direct examination, defense counsel established the fondness of the Siy family and defendant for each other. The trial court sustained an objection to a question about Berta Siy's response to defendant's request to be adopted by the Siys:

"Were you ever asked by Mark [defendant] to adopt him?

"Yes, he did couple times.

"What was your response?

"[The prosecutor]: Irrelevant.

"THE COURT: Sustained."

"BY [defense counsel]: Did you ever talk to the parents about that?

"I wish I could have adopted him then. I'm sorry.

"It's all right. It's okay. [¶] Are you all right, Mrs. Siy?"

The question whether the trial court abused its discretion in this instance is close. Plainly, defense counsel was trying to elicit from the witness whether the Siy family was unable or unwilling to adopt defendant when he asked. But we need not decide the question. In light of the witness's followup statement that she wished she could have adopted him them, and the rest of her testimony, we find no prejudice in this narrow ruling. Excluding the evidence did not appreciably weaken defendant's case in mitigation. Through the substance of Berta Siy's testimony and her apparently tearful demeanor on the stand, defendant and the Siy family's fondness for each other was apparent, and we discern no reasonable possibility of a different sentence if she had been allowed to answer the question. (*People v. Rogers* (2006) 39 Cal.4th 826, 901 [48 Cal.Rptr.3d 1, 141 P.3d 135].)

Defendant also claims that the ruling denied him his constitutional right to present a defense. We disagree. The complete exclusion of defense evidence could " 'theoretically could rise to [the] level' " (*People v. Boyette, supra,* 29 Cal.4th 381, 428) of a due process violation. But short of a total preclusion of

defendant's ability to present a mitigating case to the trier of fact, no due process violation occurs; even " '[i]f the trial court misstepped, "[its] ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." ' " (*Ibid.*) Limiting Berta Siy's testimony in this minor fashion, even if an abuse of discretion under state law, fell well short of constituting a due process violation.

### h. *Family Friend's Concerns About Defendant's Welfare*

Defendant claims that the trial court erred in sustaining, on relevance grounds, the prosecution's objection to a question he put to a family friend, Paul Roelen, whether he was concerned about defendant's welfare based on his knowledge of conditions in defendant's household in early 1993. Witnesses testified at the penalty phase that defendant's home life was difficult. Roelen testified that defendant had no bed or bedroom and slept on the floor. He also testified about the unpleasant conditions in defendant's residence: Pierre Sarrazin was arrogant, drug usage was rife, defendant and his sister had to tend to their own welfare, and life in the house was generally chaotic and tense. During a brief redirect examination, defense counsel asked, "Based upon your time there at the Sarrazin house and your observations, were you concerned about Mark [defendant]?" When the prosecutor objected on relevance grounds, the trial court sustained the objection.

On appeal, defendant argues that the evidence was relevant lay opinion testimony. We disagree. The trial court did not abuse its discretion (*People v. Carter, supra,* 36 Cal.4th 1114, 1166–1167) in ruling that the question was irrelevant. It could reasonably rule that inasmuch as it called for Roelen's lay opinion, the answer would not have been "[h]elpful to a clear understanding of his testimony" (Evid. Code, § 800). The jury had just heard Roelen's testimony about conditions in defendant's house in 1993. His testimony was clear and detailed, and there was no need to elicit an opinion to clarify testimony that was already perfectly understandable to the trier of fact.

### i. *Cumulative Error*

Defendant contends that the cumulative effect of the trial court's rulings sustaining the prosecutor's objections to his proffered mitigating evidence was prejudicial. However, we have found only one assumed error—sustaining an objection to a question about Berta Siy's response to defendant's request to be adopted by the Siys. We have found no prejudice from that single ruling. Accordingly, there was no error to cumulate.

### j. *Factor (k) Claim*

 Defendant claims as an additional legal consequence that the rulings violated his right to present mitigating evidence. This right, however, does not trump or override the ordinary rules of evidence. (See *People v. Brown, supra,* 31 Cal.4th 518, 577 [as a constitutional matter, trial courts retain authority to exclude evidence that has no bearing on a defendant's character or record or the circumstances of the offense].) As already explained, any error in sustaining the single question about Berta Siy's response to defendant's request to be adopted was harmless.

### 4. *Prosecutorial Misconduct*

Defendant maintains that the prosecutor engaged in misconduct at the penalty phase. We disagree.

In almost all instances, defendant did not object at trial to the misconduct he perceives on appeal. A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety. (*People v. Ayala, supra,* 23 Cal.4th 225, 284.) In this case, a timely objection and request for admonition would have cured any resulting harm. (See *People v. Farnam* (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Defendant's claims regarding the conduct he did not object to at trial are therefore forfeited on appeal. Exceptions will be noted below.

 We also see no misconduct. Most of defendant's contentions relate to closing argument. At that stage, prosecutors have wide latitude to discuss and draw inferences from the evidence presented at trial. " 'Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 337 [30 Cal.Rptr.3d 513, 114 P.3d 758].) The prosecutor stayed within proper bounds. Defendant also raises one complaint regarding the prosecutor's presentation of evidence. We turn to each contention.

### a. *Remarks on Defendant's Learning and Emotional Difficulties*

Defendant complains that the prosecutor should have argued he was deserving of death despite his learning disabilities and emotional and psychological problems, rather than choosing to dispute the existence of these disabilities and "relying on disinformation and ridicule to distract from the reality and allow the jury to get off the moral hook of voting to execute

a troubled young man . . . ." Defendant contends the prosecutor used "questionable expert testimony" and "belittl[ed] the whole idea of learning disabilities."

The claims are meritless. Defendant overlooks the prosecutor's role at the penalty phase, which includes inviting the jury to draw the inferences most favorable to his position within the limits set by the evidence. Prosecutors may attack the defense case and argument. "Doing so is proper and is, indeed, the essence of advocacy." (*People v. Smith, supra*, 30 Cal.4th at p. 635.) As described, defendant presented evidence of his psychological impairments in mitigation. The prosecutor was within his rights to present evidence and argument that defendant's evidence did not accurately portray his condition. (See *People v. Maury* (2003) 30 Cal.4th 342, 420 [133 Cal.Rptr.2d 561, 68 P.3d 1] [jury is entitled to consider sympathy, but is not required to do so, and a prosecutor may argue that the facts do not warrant it]; *People v. Farnam, supra*, 28 Cal.4th 107, 171 [prosecutor has wide latitude to rebut and argue against the defense case].)

Defendant characterizes the testimony of a prosecution expert, Linda Calvin, as "questionable," pointing to the fee paid to her as evidence that the prosecution purchased her research results. As described, Calvin testified there was no conclusive evidence that defendant suffered from attention deficit disorder or ADHD, that if he had a learning disorder, it was mild to moderate, and that he possessed average intelligence. The prosecution was entitled to present Calvin's testimony to refute defendant's mitigating evidence of his cognitive and emotional impairments. In turn, of course, defendant was entitled to cross-examine Calvin and argue against her, attacking her credibility and the weight to be given her testimony.

Defendant contends that the prosecutor committed misconduct in suggesting that defendant was relying on an "abuse excuse" and in ridiculing the bureaucratic jargon of the educational establishment. The record shows that the prosecutor was scorning what he argued was school officials' predilection for euphemisms—obtuse phraseology masking their unwillingness to grapple with the reality of serious student misconduct. The prosecutor's remarks were well within the bounds of acceptable comment based upon the evidence, given that defendant was asking the jury to mitigate his penalty based on his personal history. " 'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence . . . .' " (*People v. Boyette, supra*, 29 Cal.4th 381, 433; see also *People v. Maury, supra*, 30 Cal.4th 342, 420.)

### b. *Purported Sarcasm*

Defendant contends that the prosecutor committed misconduct by engaging in sarcasm and snide comments to belittle his case. He notes in particular the prosecution's disparaging characterization of section 190.3, factor (k), as a law that permits a criminal defendant to present any possible excuses for his conduct and the prosecutor's comments generally that the mitigation case was deficient and inconsistent with the tenets of a civilized society.

These claims are unpersuasive. As noted, the prosecution is entitled to argue that the facts presented by a defendant at the penalty phase of a death penalty case do not warrant sympathy. As in *People v. Maury, supra,* 30 Cal.4th 342, 420, the prosecutor did not tell the jury it could not consider sympathy for defendant—in fact he said it could—but instead urged, as he was entitled to do, that the defense evidence did not call for the extension of mercy to defendant as a result of that sympathy.

### c. *Alleged Appeal to Political Prejudices*

Defendant draws our attention to two comments that he asserts were improper appeals to jurors' "conservative political prejudices." An educational consultant, Carol Horwich Luber, testified that the school system failed to provide specialized services that would have made defendant "a much more successful student in elementary, junior high and high school." Defendant contends that the prosecutor committed misconduct in describing Luber's testimony as unduly critical of the school system. The prosecutor argued that she was probably a professional complainer, a "pain in the neck" who would demand that the system follow her preferred course of action and might sue if it did not. Second, the prosecutor argued in effect that defendant was a layabout who had spurned work opportunities and instead had been receiving support from the state and a private charity before he committed the capital crime.

As stated, " '[t]he prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence . . . .' " (*People v. Boyette, supra,* 29 Cal.4th 381, 433.) The comment relating to Luber was colorful but not improper.

The prosecutor's argument that defendant had squandered opportunities in his short life before committing the capital crime also was not misconduct. He fairly pointed out that defendant's story was not limited to his childhood and adolescent difficulties; defendant had received help and opportunities from his family, counselors, and society in the form of employment, money, and food.

#### d. *Alleged Appeal to Regional Prejudices*

In closing argument, defendant told the jury that the two "Hillside Strangler" murderers had avoided the death penalty and urged that he was not as bad as they. He argues that the prosecutor committed misconduct during rebuttal argument, when he argued that to the extent the jurors were unfamiliar with the evidence in that case, the comparison was inapposite, and further suggested that the county in which the "Hillside Strangler" murderers were tried might have had an effect on the determination of their sentence. There was no misconduct, but only fair argument in response to defendant's invocation of the "Hillside Strangler" case in support of a life sentence. (*People v. Farnam, supra*, 28 Cal.4th 107, 171.)

#### e. *Adolescent Misconduct*

Defendant next contends the prosecutor engaged in misconduct by overemphasizing what defendant views as evidence of trivial and typical adolescent misbehavior. In particular, defendant refers to the prosecutor's focus on instances of his misconduct in high school in the prosecution's rebuttal case. As noted, defendant taunted one physically handicapped classmate and another student with a hygiene problem, and encouraged other students to do the same.

Defendant first complains that the prosecutor should not have introduced the rebuttal evidence. With regard to the evidence of taunting the handicapped student, defendant raised objections at trial on unrelated evidentiary grounds, but not on the ground that the prosecutor was committing misconduct. With regard to the testimony regarding the student with the hygiene problem, defendant interposed no objection on any ground. He has not preserved his claims for review. (*People v. Partida, supra*, 37 Cal.4th 428, 435.)

Defendant next complains that the prosecutor should not have emphasized his adolescent misconduct at closing argument. In his view, the misconduct was so trivial that to bring it to bear on the question whether he should live or die was unseemly. Again, however, he failed to seek a remedy at trial, and has not preserved the claims for review. (*People v. Ayala, supra*, 23 Cal.4th 225, 284.)

Defendant's contentions also fail on their merits.

With regard to the presentation of evidence: defendant had presented a thorough case that he was, in effect, a victim of a substandard upbringing, neglect by school officials, and psychological difficulties—in sum, not fully in

command of himself—and thus his behavior was not as blameworthy as it would have been in the case of someone who had not been similarly disadvantaged. He also presented evidence of his positive personal qualities, in the form of Berta Siy's statement that he had been and was still a nice person.

In light of the defense presentation, the prosecutor was entitled to introduce evidence in rebuttal that defendant was cruel and callous toward others in varied situations, suggesting that intrinsic evil rather than external circumstances out of defendant's control predominated in governing his behavior or was the sole cause of it. (See *In re Lucas* (2004) 33 Cal.4th 682, 720, 719 [16 Cal.Rptr.3d 331, 94 P.3d 477] [suggesting that to rebut "evidence of institutional failure and positive character traits," the prosecution could introduce evidence "that from a very early age, petitioner demonstrated lack of conscience, a propensity for violence, and defiance of authority that did not respond to psychotherapy and that he committed criminal offenses as a juvenile, was subject to temper tantrums and uncontrollable rages as a child, was destructive, and sought only to please himself"].) With regard to argument, as noted, it is the prosecutor's role to question the soundness of a defense case, and he did not engage in misconduct by giving the jury a more nuanced view of what mitigating weight should be given to defendant's social history, learning disabilities, and emotional problems. (See *People v. Smith, supra,* 30 Cal.4th 581, 635.)

### f. *Alleged Logical Fallacies and Illogical Argument*

Defendant identifies specific portions of the prosecutor's closing argument as constituting misconduct because they contained logical fallacies, such as non sequiturs, or made no logical sense. He argues that these lapses were deliberate and calculated. Specifically, defendant complains that (1) because evidence about his difficult birth and his mother's prenatal drug use related to whether he was mentally impaired, the prosecutor argued improperly when he contended that what happened before defendant was born did not weigh on his blameworthiness for his crimes; (2) because evidence was presented that babies who fail to thrive early in life may have long-term learning and behavior problems, the prosecutor improperly argued that defendant's failure to thrive during the first six months was insignificant as defendant could have no memory of it; (3) because evidence was presented that defendant was a disfavored stepchild and suffered learning disabilities, the prosecutor improperly argued that the defense's failure to present evidence that defendant's half sister, Chantal, suffered similar difficulties undercut the defense's theory that defendant was merely a product of his environment; (4) because the prosecutor did not address the broader question whether defendant's home life could have led him to any form of violence, he improperly argued that defendant's

home life did not make him a murderer; and (5) because the prosecutor's reasoning relied on a false assumption that the skills required for academic and mechanical tasks are the same, and that those with learning disabilities cannot do mechanical tasks, the prosecutor argued improperly in contending that defendant's ability to take apart a carburetor and put it back together showed his brain worked well and refuted evidence of learning disabilities in an academic environment.

Again, defendant's complaints are meritless. The prosecutor was arguing, as he was entitled to do, that the penalty phase evidence did not warrant sympathy. (See *People v. Maury, supra,* 30 Cal.4th 342, 420.)

### g. *References to Juvenile Offense As a Felony*

Defendant argues that defendant's juvenile car burglary, evidence of which was introduced at the guilt phase, should not have been referred to as a felony by the prosecutor in closing argument.

Defendant cites two separate instances of alleged misconduct. The prosecutor reminded the jury not to consider his juvenile burglary as aggravating evidence under section 190.3, factor (c). Later, the prosecutor, over defendant's objection, argued that defendant committed burglaries and called one of them a felony, even as he reminded the jury that because of defendant's age the jurors could not consider that burglary in aggravation.

Defendant's claims regarding the first instance are forfeited. The second set of claims are preserved for review. Both, however, fail on the merits. We have already explained there was nothing improper in reminding the jury not to consider in aggravation conduct that it was not entitled to consider. As for the second comment, it was not misconduct for the prosecutor to point out that the statutory factors of defendant's age and his lack of felony convictions should not be given much weight in mitigation, since he had squandered opportunities for positive change after being put on probation for the felony juvenile matter.

### h. *Invoking Defendant's Statement Evincing Indifference*

Defendant contends the prosecution committed misconduct in invoking his extrajudicial statement that "I don't care about her," meaning his murder victim, Kellie O'Sullivan, in an effort to persuade the jury to see defendant as indifferent to O'Sullivan's death and as having no remorse for murdering her.

The prosecutor could urge that remorse was unavailable as a factor in mitigation. " '[P]ostcrime evidence of remorselessness does not fit within

any statutory sentencing factor, and thus should not be urged as aggravating.' [Citation.] When evidence of postcrime remorselessness has been presented, however, the prosecutor may 'stress that remorse is not available as a mitigating factor.' " (*People v. Pollock, supra*, 32 Cal.4th 1153, 1184–1185, italics omitted.) The prosecutor did no more than he was entitled to do. Thus, defendant's claims are without merit.

### i. *Allegedly Hinting at Defendant's Failure to Testify at the Penalty Phase*

Defendant contends that the prosecution improperly made veiled references to him not taking the stand at the penalty phase. Specifically, defendant complains about the prosecutor's comments that a defendant seeking mercy should at least present evidence that he or she "is sincerely and genuinely remorseful" and that defendant did not show "that within a short amount of time he was sincerely and genuinely remorseful about what he did."

Defendant objected to the first remark as being improper argument and was overruled, but did not object to the second. Respondent maintains that any claim regarding the second remark is forfeited for purposes of appeal. (See *People v. Farnam, supra*, 28 Cal.4th 107, 167.) We disagree. Any objection to the prosecutor's second remark would have been futile. Both prosecutorial remarks touched on defendant's lack of sincere and genuine remorse, and the second followed immediately after the trial court overruled defendant's objection to the first. Defendant has preserved his claims for review with regard to both prosecutorial remarks.

There was, however, no misconduct. The prosecutor's remarks constituted fair argument regarding the lack of evidence of remorse. As noted, such argument is proper to show the absence of remorse as a mitigating factor. (*People v. Pollock, supra*, 32 Cal.4th 1153, 1184–1185.) The prosecutor was arguing that defendant had shown no remorse, not commenting on defendant's failure to testify.

### j. *Alleged Pattern of Misconduct Warranting Reversal*

Defendant contends that the foregoing occurrences, considered together, established a pattern of misconduct that warrants reversal. His claims fail for want of a sufficient factual predicate: there was no misconduct.

### 5. *Procedure for Replacing Excused Juror*

At the penalty phase, it became necessary to replace a sitting juror with an alternate. The court did so by choosing one of the alternates by random draw.

(See § 1089.) Defendant asserts that the prosecutor should have agreed to depart from the statutory procedure for replacing an ill seated juror and stipulate that the trial court could select the sole female alternate juror. He claims that the prosecutor's failure to do so violated the federal constitutional guaranty of equal protection of the laws (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*)), the state constitutional right to a jury drawn from a representative cross-section of the community (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*)), and his rights to a reliable and fundamentally fair trial under the Eighth and Fourteenth Amendments.

On the morning of March 13, 1995, after the parties had rested their cases at the penalty phase, but before closing arguments began, the trial court learned that one of the seated jurors was ill and could not return to court for several days. The defense initially agreed that the seated juror likely could be excused for cause, but ultimately asked the court to ask the juror's doctor how long he would be absent. The prosecutor agreed.

During the discussion about the juror's health the prosecutor asked about the method that would be used to pick an alternate if it proved to be necessary. Defense counsel replied, "I did not know it was open for discussion. My experience has always been that jurors or alternates are selected in the order in which they are numbered." The court replied, "Well, actually the Code says you are to draw, unless there's an agreement to the contrary." The prosecutor asked about the order in which the alternates were numbered, and the court replied that the first alternate was "Miss [C.]," and the other three, in order, were "Mr. [M.], . . . Mr. [C.] and . . . Mr. [S.]. Alternate Number 1 is the only lady among the alternates." Without commenting on the gender of any of the alternates, the prosecutor said, "We would vote for following the procedure in the Code that we just select them out of the hat. That's the way it has been done in, I think, every trial that I have ever had." The court replied, "Well, the law is that you do that unless there's an agreement to do something else. Unless there is an agreement to do something else, that's what we will do."

After lunch that day the trial court announced that it had been informed the juror could not return for a week and suggested he be replaced. The prosecution agreed, but defense counsel objected, asking that the trial be continued until the juror could return and commenting that the continuance would be for only three court days. The prosecution again said it preferred to replace the juror by random draw from among the alternates, and the court ruled against defendant, finding good cause to replace the ill juror (see § 1089). The clerk drew at random from a box the name of Alternate Juror Keith C., a male. When trial resumed the next day, Keith C. took his seat as a member of the jury and the parties proceeded with closing argument.

In replacing the ill juror by random drawing, the trial court was following the mandate of section 1089. As relevant here, section 1089 provides: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and *draw the name* of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." (Italics added.)

We turn to defendant's *Batson-Wheeler* claim. A prosecutor's use of *peremptory challenges* to strike prospective jurors on the basis of group bias violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under the state Constitution (*Wheeler, supra,* 22 Cal.3d 258, 276–277; *People v. Griffin, supra,* 33 Cal.4th 536, 553) and the defendant's right to equal protection under the Fourteenth Amendment (*Batson, supra,* 476 U.S. 79, 88). Defendant argues that the *Batson-Wheeler* prohibitions logically apply to a prosecutor's decision (as he views the prosecutor's action) to exclude an alternate juror from joining the jury based on gender.

██ Defendant did not raise a *Batson-Wheeler* challenge at trial, and has forfeited the claim. "A defendant who believes the prosecution is improperly using *peremptory challenges* for a discriminatory purpose is required to 'raise a timely objection and make a prima facie showing that jurors are being excluded on the basis of racial or group identity.' " (*People v. Morrison* (2004) 34 Cal.4th 698, 709 [21 Cal.Rptr.3d 682, 101 P.3d 568], italics added.) The foregoing rule also applies when a party invokes a *Batson-Wheeler* claim based on a novel theory that the protection conferred by those cases extends to the method of replacing an excused juror with an alternate.

Turning to the merits, we see no *Batson-Wheeler* violation. The trial court mentioned in an inconsequential aside (inconsequential because § 1089 specifies a random drawing of an alternate to replace a seated juror) that the first alternate juror was the only woman among the four alternates. But the prosecutor never said anything about the gender of any of the alternate jurors or did anything to preclude her or reduce her chance of joining the seated jurors. Rather, the prosecutor merely deferred to the provisions of the Penal Code. He simply asked for an alternate juror to be picked at random because that is what section 1089 specifies and he had never heard of substituting a juror by any other method.

Defendant's Eighth and Fourteenth Amendment claims are forfeited because he did not present them to the trial court. (*People v. Partida, supra,* 37

Cal.4th 428, 435.) In any event, those claims lack merit. The court followed the rule set forth in section 1089, and insofar as there were legal grounds to discharge the ill juror and replace that juror with an alternate, no constitutional violation occurred. (See *People v. Boyette, supra,* 29 Cal.4th 381, 461–463 & fn. 20.)

### 6. *Evidence and Instructions Regarding Prior Crimes*

Defendant claims he was "overcharged" under section 190.3, factor (b), because the trial court (1) permitted the prosecution to introduce evidence under factor (b) that fell outside its scope, and (2) gave a special instruction that (a) listed individual instances of possible aggravating conduct under more than one criminal statute, and (b) segmented single criminal courses of conduct (i.e., criminal transactions) into separate offenses. He maintains that the court compounded the errors by failing to instruct the jury not to double-count defendant's misconduct under separate penal provisions, by giving a biased instruction on his possessing a contraband razor in jail, and by failing to give CALJIC No. 12.42. He claims that the foregoing acts and omissions violated factor (b) and the reliable penalty determination required by the Eighth Amendment to the federal Constitution.

### a. *Evidentiary Issue*

Before the penalty phase began, defendant moved to exclude evidence of certain alleged acts that in his view did not amount to "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) As relevant to this appeal, defendant argued at two hearings that the following acts did not fall under factor (b): his struggle with Stephanie C. on September 10, 1993; his attempts to escape from the Reno police after his arrest on September 20, 1993; and his struggle with sheriff's deputies in jail on January 14, 1994. The trial court granted defendant's motion in minor part, but, in the main, ruled that the evidence of each incident fell within the ambit of factor (b).

On appeal, defendant renews his argument that the evidence of these events should have been excluded because it did not lie within the scope of section 190.3, factor (b). We disagree in each case. As noted, defendant showed up at Stephanie C.'s workplace and pushed her to the ground. That was battery (§ 242). He struggled with Reno police officers and they had to summon a van they use to control combative prisoners. Those were violent (see § 69) and willful (see § 148, former subd. (a), as amended by Stats. 1990, ch. 1181, § 1, p. 4930) physical acts of resistance against the officers in the performance of their duties involving either violence or the threat of it. In the January 14,

1994, in-custody incident, defendant had to be subdued by sheriff's deputies and told them, "I was looking to stick your ass." Each of the foregoing incidents constituted "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) Because the evidence was properly introduced under factor (b), there was no violation of defendant's right to a reliable penalty determination under the Eighth and Fourteenth Amendments to the federal Constitution. (*People v. Lewis and Oliver, supra,* 39 Cal.4th 970, 1051–1054.)

b. *Instructional Issues*

i. *Claim of Inflating of Aggravating Criminal Conduct*

The prosecution sought an instruction, based on CALJIC No. 8.87, listing 16 possible aggravating acts for the jury's consideration under section 190.3, factor (b). Defendant requested a different instruction which listed far fewer criminal acts. After hearing argument, the trial court gave the prosecution's instruction. Defendant argues that the instruction improperly allowed the jury to double-count the same conduct under more than one statutory provision.

We rejected a similar claim in *People v. Davis* (1995) 10 Cal.4th 463 [41 Cal.Rptr.2d 826, 896 P.2d 119]. In *Davis,* the "defendant was charged in [a] samurai sword incident with misdemeanor battery and brandishing, [and] was convicted of brandishing only. At the prosecutor's request, and over defendant's objection, the trial court instructed the jury that it could consider the samurai sword incident in aggravation for brandishing, battery, and assault with a deadly weapon. It instructed the jury on the elements of all three offenses." (*Id.* at p. 543.) As here, the defendant argued the court should have instructed the jury on only one crime per incident. We disagreed. "Evidence of prior violent conduct is admitted under Penal Code section 190.3, factor (b), 'to enable the jury to make an individualized assessment of the character and history of the defendant to determine the nature of the punishment to be imposed.' [Citation.] ' "[I]t is not [only] the fact of conviction which is probative in the penalty phase, but rather the conduct of the defendant which gave rise to the offense." ' [Citation.] Indeed, Penal Code section 190.3, factor (b), 'expressly permits proof of any violent "criminal activity" regardless of whether it led to prosecution or conviction.' [Citation.] [¶] It is thus irrelevant that defendant was not convicted of, or formally charged with, the crime of assault with a deadly weapon. The jury was properly permitted to consider defendant's conduct in aggravation if it determined that the elements of the crime of assault with a deadly weapon were proved beyond a reasonable doubt." (*Id.* at p. 544, italics omitted.)

Defendant offers no convincing reason why we should depart from the conclusion we reached in *Davis*. We reject his claim that the court's action improperly inflated the case in aggravation. His Eighth and Fourteenth Amendment claims, predicated as they are on his state law claim, also fail. (*People v. Davis, supra*, 10 Cal.4th 463, 544, fn. 40.) Finally, under the reasoning of *Davis*, we do not discern any violation of defendant's due process rights. The instructions were permissible under state law.

We also reject defendant's contention that the court prejudicially erred in failing to instruct the jury that where it was presented with multiple offenses arising from the same course of conduct it could consider such multiple offenses only if they involved separate acts and distinct violations of law making the conduct more blameworthy. Defendant relies in this respect on *People v. Melton* (1988) 44 Cal.3d 713, 765–767 [244 Cal.Rptr. 867, 750 P.2d 741], which suggested a similar principle in an arguably analogous context. But neither *Melton* nor any other authority we are aware of supports the existence of a sua sponte duty to give such an instruction. Nor would any error in failing to so instruct have been prejudicial under any standard of prejudice. No reasonable possibility exists that the jury was moved to a sentence of death by the number of offenses listed in aggravation as opposed to defendant's violent conduct itself, which the jury heard described. (See *id.* at p. 768 [concluding "the possibility of actual prejudice seems remote"].)

### ii. *Possessing Deadly Weapon in Jail*

Defendant contends that giving the following prosecution-proposed instruction regarding the evidence of his possessing a contraband razor blade in jail (see § 4574, subd. (a)) was unfairly tilted toward the prosecution's case: "Every person who while confined in a county jail possesses any deadly weapon is guilty of a felony. [¶] An object should be evaluated as to its potential use when determining whether it is a deadly weapon." Defendant maintains that the instruction was "one-sided" and argues that because section 4574 proscribes possessing a deadly weapon in jail without any intent requirement (*People v. Grayson* (2000) 83 Cal.App.4th 479, 486 [99 Cal.Rptr.2d 701]), either the trial court should not have allowed an instruction on these incidents or, if it was to be given, CALJIC No. 12.42 should have been given to require the jurors to find that defendant intended to use the razor blades within the meaning of section 190.3, factor (b).

Possessing a contraband razor in jail (§ 4574, subd. (a)) is a violent offense for purposes of section 190.3, factor (b). (*People v. Pollock, supra*, 32 Cal.4th 1153, 1178.) Defendant's claim regarding CALJIC No. 12.42 must be rejected. At the time, CALJIC No. 12.42 provided as follows: "In determining if the instrument or object in this case was a weapon of the kind within

the law as stated, you may consider the circumstances attending any possession of the instrument or object by the defendant, such as the time and place of its possession; the destination of the possessor; any alteration of the object from its standard form; and evidence, if any, indicating its intended use by the possessor for a dangerous rather than a harmless purpose." (CALJIC No. 12.42 (5th ed. 1988).)

CALJIC No. 12.42, however, is inapplicable to a charge under section 4574, subdivision (a). The Use Note to CALJIC No. 12.42 accurately observes, "This instruction is essential when the questioned object is an innocent-appearing utensil capable of use as a dangerous object." In such a case, the trier of fact must find criminal intent on the part of the possessor before finding him or her guilty of the offense. As we explained, discussing a statute proscribing possession of a slugging weapon, "The Legislature here sought to outlaw the classic instruments of violence and their homemade equivalents; the Legislature sought likewise to outlaw possession of the sometimes-useful object when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicated that the possessor would use the object for a dangerous, not harmless, purpose." (*People v. Grubb* (1966) 63 Cal.2d 614, 620–621 [47 Cal.Rptr. 772, 408 P.2d 100].) "The Legislature thus decrees as criminal the possession of ordinarily harmless objects when the circumstances of possession demonstrate an immediate atmosphere of danger. Accordingly the statute would encompass the possession of a table leg, in one sense an obviously useful item, when it is detached from the table and carried at night in a 'tough' neighborhood to the scene of a riot. On the other hand the section would not penalize the Little Leaguer at bat in a baseball game." (*Id.* at p. 621.) The same considerations do not apply to section 4574, which contains no intent requirement (*People v. Grayson, supra,* 83 Cal.App.4th 479, 486; see also *People v. Rubalcava* (2000) 23 Cal.4th 322, 325, 333–334 [96 Cal.Rptr.2d 735, 1 P.3d 52]). In sum, "CALJIC No. 12.42 . . . [is] inapplicable . . . . Section 4574, subdivision (a) prohibits the unauthorized possession of deadly weapons by confined inmates at all *times,* in all (confined) *places,* at all *destinations,* regardless of *alteration.*" (*People v. Savedra* (1993) 15 Cal.App.4th 738, 743 [19 Cal.Rptr.2d 115].)

### 7. *Refusal to Give Special Age-related Factor (i) Instruction*

Defendant claims the court erred in violation of various constitutional rights by refusing to give this instruction he requested regarding his age:

"One of the factors for you to consider in determining the penalty is the age of the defendant at the time of the offense(s).

"Defendant was 19 years [old] when he committed the crimes of which you have found him guilty. You may consider that had he been under 18 years old when the crimes were committed, he would not be subject to the death penalty.

"Chronological age, by itself, is a matter over which the defendant has no control, and which is not relevant to the choice of penalty.

"However, the factor relating to 'defendant's age,' as set forth in these instructions, refers to any matter concerning defendant's age, maturity, and judgment that common experience or morality might indicate to be relevant to the issue of penalty.

"You shall therefore give any such age-related factors consideration in arriving at a judgment as to penalty."

The trial court said it had a "problem" with defendant's proposed instruction, which it regarded as "argumentative." "[I]f I gave this," the court continued, "I think I ought to give one for the People about the negative things they can dredge up about the Defendant's young age, and that is he had committed an awful lot of crimes by the time he was 18."

Accordingly, the trial court refused defendant's proposed special instruction and gave the standard section 190.3, factor (i) instruction regarding defendant's age, instructing the jury that it "shall consider," "if applicable," "[t]he age of the defendant at the time of the crime." (CALJIC No. 8.85 (5th ed. 1988).)

The instruction was argumentative and the trial court properly refused to give it. In *People v. Brown, supra,* 31 Cal.4th 518, we stated that the trial court properly refused to give "the following instruction: 'An individual under 18 is not subject to the death penalty. You may consider the fact that Mr. Brown was 19 at the time of this offense.' " (*Id.* at p. 564.) We stated that "the trial court correctly refused the proffered instruction. '[T]he general rule is that a trial court may refuse a proffered instruction if it . . . is argumentative, or is duplicative.' [Citation.] 'Although instructions pinpointing the theory of the defense might be appropriate, a defendant is not entitled to instructions that simply recite facts favorable to him.' [Citation.] By instructing the jury that those younger than 18 years old are legally ineligible for the death penalty, the proffered instruction highlighted a single, mitigating aspect of defendant's age—that he had only recently become eligible for the ultimate penalty—and was thus improperly argumentative." (*Id.* at pp. 564–565.) Defendant's proposed instruction was similarly argumentative and, hence, properly refused.

### 8. *Failure to Instruct on Burden of Proof*

Defendant argues that the trial court violated various constitutional rights when it failed to instruct the jury that there was no burden of proof on either party. "Jurors who believe[d] the burden should be on the defendant to prove mitigation in [the] penalty phase would continue to believe that," he contends.

■■■ There is no burden of proof or persuasion on either party at the penalty phase of a capital trial. (E.g., *People v. Hughes, supra*, 27 Cal.4th 287, 394.) Nevertheless, we reject defendant's contention that the jury must expressly be so instructed. To be sure, it is not error if a trial court chooses to instruct the jury in the broad terms defendant would have preferred, i.e., that there is no burden of proof on either party. (*People v. Williams* (1988) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395] [case tried under 1977 death penalty law], cited with approval in *People v. Ledesma* (2006) 39 Cal.4th 641, 739 [47 Cal.Rptr.3d 326, 140 P.3d 657] [case tried under 1977 death penalty law]; see also *People v. Ainsworth* (1988) 45 Cal.3d 984, 1031 [248 Cal.Rptr. 568, 755 P.2d 1017] [in case tried under 1977 death penalty law, "[b]y stipulation of the parties, the court had also instructed that 'for this phase of the proceeding there is no burden of proof on either side of the case' "].) But defendant benefited from a more precise and helpful instruction regarding the jury's task: the court properly instructed the jurors that they were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider," and that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." This satisfied instructional requirements regarding the lack of a burden of proof or persuasion at the penalty phase. (See *People v. Hughes, supra*, at p. 394 [quoting materially identical instructional language in rejecting a claim that prosecutorial remarks shifted to the defendant the burdens of proof and persuasion of showing that he deserved to live].)

### C. *Miscellaneous Issues*

Defendant raises additional challenges to California's death penalty statute and to other aspects of California law, as interpreted by this court and as applied at his trial. We adhere to the decisions that have rejected similar claims, and decline to reconsider such authorities, as follows:

The death penalty law adequately narrows the class of death-eligible offenders. (*People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

Section 190.3, factor (a), is not unconstitutionally overbroad, arbitrary, capricious, or vague, whether on its face (*People v. Guerra* (2006) 37 Cal.4th 1067, 1165 [40 Cal.Rptr.3d 118, 129 P.3d 321]) or as applied to defendant.

The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence. (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Except for section 190.3, factor (b), no burden of proof is constitutionally required at the penalty phase. (*People v. Moon* (2005) 37 Cal.4th 1, 43 [32 Cal.Rptr.3d 894, 117 P.3d 591].) And there is no constitutional requirement that the jury find aggravating factors unanimously. (*People v. Osband* (1996) 13 Cal.4th 622, 709–710 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

Neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], has changed our prior conclusions regarding burden of proof or jury unanimity. (*People v. Lewis and Oliver, supra,* 39 Cal.4th 970, 1068.)

There is no requirement that the jury prepare written findings identifying the aggravating factors on which it relied. (*People v. Cook* (2006) 39 Cal.4th 566, 619 [47 Cal.Rptr.3d 22].)

The statutory scheme is not unconstitutional insofar as it does not contain disparate sentence review (i.e., comparative or intercase proportionality review). (*People v. Lewis and Oliver, supra,* 39 Cal.4th 970, 1067.)

Allowing consideration of unadjudicated criminal activity under section 190.3, factor (b) is not unconstitutional as a general matter; moreover, and contrary to defendant's argument, it does not render a death sentence unreliable. (*People v. Morrison, supra,* 34 Cal.4th 698, 729.) Neither *Apprendi v. New Jersey, supra,* 530 U.S. 466, nor *Ring v. Arizona, supra,* 536 U.S. 584, affects our conclusion that factor (b) is constitutional. (*People v. Ward* (2005) 36 Cal.4th 186, 221–222 [30 Cal.Rptr.3d 464, 114 P.3d 717].)

The use of such adjectives in the sentencing factors as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (*id.,* factor (g)) is constitutional. (*People v. Avila* (2006) 38 Cal.4th 491, 614 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

There is no requirement that the jury be instructed on which factors are mitigating and which are aggravating. (*People v. Vieira* (2005) 35 Cal.4th 264, 299 [25 Cal.Rptr.3d 337, 106 P.3d 990].)

The guaranty of equal protection of the laws does not require this court to give capital defendants the same sentence review afforded other felons under the determinate sentencing law. (*People v. Cox, supra,* 30 Cal.4th 916, 970.)

The judgment and sentence against defendant do not violate international law. (*People v. Lewis and Oliver, supra*, 39 Cal.4th 970, 1066.) Nor does California's asserted status as being in the minority of jurisdictions world-wide that impose capital punishment, or this jurisdiction's asserted contrast with the nations of western Europe in that we impose capital punishment and they purportedly either do not or do so only in exceptional circumstances, result in any violation of the Eighth Amendment to the federal Constitution. (*People v. Moon, supra*, 37 Cal.4th 1, 47–48.) The record contains no suggestion that defendant is a foreign national or a dual national.

### D. Cumulative Error

Defendant argues that the cumulative effect of the asserted errors requires us to reverse the judgment. We disagree. We have found no reversible error in any particular instance, and any errors that may have occurred do not, separately or together, entitle defendant to relief. His trial was fair.

### E. Indeterminate Term Issue

As to count 4, the jury found defendant guilty of kidnapping for robbery under section 209, subdivision (b). With regard to this count, it also found true that the victim "suffered bodily harm and death," and that defendant intentionally inflicted great bodily injury on her. The trial court sentenced defendant to a term of life imprisonment *without* possibility of parole on this count. Defendant contends the court erred. We agree.

At the time of the crime, section 209, subdivision (b), provided: "Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life *with possibility of parole*." (Stats. 1990, ch. 55, § 3, p. 394, italics added.) It appears the trial court relied on section 209, subdivision (a), for the sentence it imposed. Subdivision (a) provides that the sentence for kidnapping for ransom is life without the possibility of parole when bodily harm is involved. (See *People v. Nguyen* (2000) 22 Cal.4th 872, 884 [95 Cal.Rptr.2d 178, 997 P.2d 493].) However, as we explained in *Nguyen*, in 1976, "section 209 was reconfig-ured, segregating the crime of kidnapping for ransom, extortion or reward into subdivision (a) of the section and that of kidnapping for robbery into subdivision (b)." (*Ibid.*) In contrast to section 209, subdivision (a), "[t]he new subdivision (b) of section 209 . . . made no reference to bodily harm, nor did it retain the increased penalty of life imprisonment without the possibility of parole." (*People v. Nguyen, supra*, at pp. 884–885.) "In other words, by its terms the statute did not carry over [from the prior version of section 209] to the crime of kidnapping for robbery, now set forth in new section 209, subdivision (b), a linkage of 'bodily harm' with an increased penalty." (*People v. Nguyen, supra*, at p. 885.)

Because defendant was convicted of kidnapping for *robbery* under section 209, subdivision (b), rather than kidnapping for *ransom* under section 209, subdivision (a), the punishment for that count should have been life imprisonment with the possibility of parole. Accordingly, we will modify the judgment to change the sentence on count 4 from life imprisonment without possibility of parole to life imprisonment with possibility of parole.

### III. CONCLUSION

The judgment is modified to reflect a sentence of life imprisonment with possibility of parole on count 4. The trial court is directed to send an amended abstract of judgment to the Department of Corrections and Rehabilitation in accordance with this modification. As so modified, the judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 15, 2007, and the opinion was modified to read as printed above.